Christian, J.,
delivered the opinion of the court.
Daniel Dean was indicted in the county court of Scott county for the murder of Henry E. Fugate. He was found guilty of murder in the first degree, and sentenced to be hanged. His case was carried, by writ of error, to the circuit court of said county, and that court affirmed the judgment of the county court. To this judgment of the circuit court a writ of error was awarded by this court.
It appears from the record before us that between the hours of eight and nine o’clock on the morning of Monday, the 25th June, 1877, Henry E. Fugate, while plowing in his field, was shot in the back by an unseen assassin, concealed in the brush on the edge of the field. This field •was between two hundred and fifty and three hundred yards from the home of the deceased. His wife was in the garden watering her plants, when she heard a gun fired *914 in the direction of the field, and immediately heard her husband's cries, and looking in the direction from which the sound of the gun and the cries proceeded, saw the horse with which her husband had been plowing running through the field. She hastened at once to the spot, and found her husband lying on the ground, supporting himself on his arm, with his legs stretched out. When she reached him, she enquired what was the matter. His reply was, “I am shot. Some one has shot me from the brush." So far as the record shows, these were the only words spoken by the deceased. He was taken to his home by some of his neighbors ; physicians were sent for, who administered to the wounded man as best they could, but the wound proved fatal, and he died on the following Wednesday.
Daniel Dean (the plaintiff in error) was arrested and indicted in the county court of Scott county, for the murder of Fugate. There were two mistrials, the jury failing to agree in each. At the third trial, a jury brought from another county found a verdict of murder in the first degree.
Numerous witnesses were examined. The evidence is all certified. It is altogether circumstantial. There is no direct evidence as to the person who fired the fatal shot.
Now, in the very outset in this case two things must be borne in mind—-first, that circumstantial evidence must always be scanned with great caution, and can never justify a verdict of guilty, especially of murder in the first degree, the penalty of which is death, unless the circumstances proved are of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt. But secondly, it must also be remembered that there are some crimes committed with such secrecy that to require the production of a witness who saw the act committed would be to defeat public justice, to deny all protection to society, to let the greatest offenders go free, and the most heinous crimes go unpunished. .
*915 No direct evidence can ever be produced in a case like this, where the assassination is secret, and where no human eye, not even that of the unhappy victim, could see the ■ hidden foe.
Of necessity,' and from the very nature of the case, such a fact can only be proved by circumstantial evidence.
Keeping these two considerations constantly in view, let us now examine the case before us with that careful and patient deliberation which the grave and solemn issues of life and death demand at our hands.
And first, it is a subject of remark that during the long trial in the county court no objection is made (as is frequently the case), as to the misconduct of the jury, as to any outside influence, as to a separation of the jury, as to any influence of the force of popular excitement, as to any charge of prejudice and partiality.
No exception is taken by the astute and learned counsel for the prisoner to the conduct of the jury during the trial.. The jury is brought from a distant county. They are free from local prejudice, or the influence of local excitement, produced by so shocking a crime. They have no acquaintance either with the accused or with the deceased. There is not a word in the record to impeach, in the slightest degree, the integrity and impartiality of the jury. Whatever else may be uncertain, it is certain that the prisoner had a fair trial before a fair and impartial jury.
The verdict of this jury was approved by the judge who presided at the trial, and who saw and heard the witnesses, and his judgment, refusing to set aside the verdict and grant a new trial, was affirmed by the judge of the circuit court.
The grounds of error assigned, and relied upon here by the learned counsel for the prisoner, are as follows:
1st. Because the verdict is contrary to the evidence.
2d. Because the evidence is plainly insufficient to warrant the finding of the jury.
*916 3d. Because certain evidence (set forth in the previous bills of exception), offered by the commonwealth and adinitted by the court, was inadmissible.
Before we proceed to consider, in their proper order, these assignments of error, it is well to advert to certain rules of universal application, laid down by this court, in reference to the manner in which an appellate court must consider a motion for a new trial, upon the grounds set forth in the two first assignments of error.
And first it is to be observed that the facts proved are not certified by the court below; -but that the bills of exception contain a certificate of the evidence only.
In such a case, as has been repeatedly declared by this 'court, the appellate court can only consider the evidence introduced bv the commonwealth, and will not reverse the judgment unless, after rejecting all the parol evidence for the exceptor, and giving full faith and credit to that of the adverse party, the decision of the court below still appears to be wrong. Reed’s case, 22 Gratt. 924, and cases there cited, Gimmie v. Cullen, 20 Gratt. and 439, and cases there cited. In other words, the appellate' court in considering the case must discard all the evidence intro■duced by the prisoner, and admitting the truth of thecomm on wealth’s evidence, the enquiry always is, Is the verdict -contrary to that evidence. Is that evidence (admitted to be true) insufficient to warrant the verdict of the jury. And uf the case be one entirely of circumstantial evidence, the further enquiry is, are the circumstances given in evidence of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt?
There are other rules clearly and distinctly laid down ifoy this court, in respect to new trials, which must govern •the case before us, and may be succinctly stated as follows: A new trial will be granted—
1. Where the verdict is against law. This occurs when *917 the issue involves both law and fact, and the verdict is against the law of the case on the facts proved.
2. Where the verdict is contrary to the evidence. This occurs where the issue involves matter of fact only, and the facts proved required a different verdict from that found by the jury.
3. Where the verdict is without evidence to support it. This occurs where there has been no proof whatever of a material fact, or not sufficient evidence of the fact or facts in issue, where some evidence has been given which tends to prove the facts in issue; or where the evidence consists of circumstances and presumptions, a new trial will not be granted merely because the court, if upon the jury, would have given a different verdict. To warrant a new trial in such cases the evidence should .be plainly insufficient to warrant the finding of the jury. This restriction applies a fortiori to an appellate court. For in the appellate court there is superadded to the weight which must be given to the verdict of a jury fairly rendered, that of the opinion of the judge who presided at the trial, which is always entitled to peculiar respect upon the question of a new trial;
4. A new trial asked on the ground that the verdict is contrary to the evidence ought to be granted only in a case of plain deviation from right and justice. And this court will set aside a verdict on such a motion only in a case where the jury have plainly decided against the evidence,' or without evidence. Blosser v. Harshbarger, 21 Gratt. 214, and cases there cited.
Let us now apply these rules, established by repeated decisions of this court, and which must guide and govern us in our determination, to the case at bar; and say whether the jury in this case have plainly decided against the evidence, or without evidence to support their verdict. For this we must say, before we can interfere with that verdict.
The corpus delicti, the starting point in the case, is distinctly proved by direct testimony.
*918 It is certain that on the morning of the 25th of June, 1877, Henry Fugate, who but one hour before had left -home, to pursue his daily labor, was cruelly murdered, without warning, by a secret foe, while plowing in his field—shot from behind by some cowardly assassin concealed in the brush. This happened in the hearing and almost in the presence of his family. When his wife, who heard the report of the gun and the cries of her husband, and saw his horse running, hastened to the fatal spot, she found him stretched wounded upon the ground, and he exclaimed, “I am shot. Some one has shot me from the brush.” That he came to his death by the hand of another, and the manner of his death are thus distinctly proved.
Now, when so heinous and startling a crime is committed, the very first enquiry, in order to detect its foul perpetrator, always is, Who was the enemy of the murdered man ? Who had the motive to do the dreadful deed ?
It was the pursuit of this enquiry that first led to the arrest of the prisoner. It is proved in the record before us that some months before the murder—to wit: at the January term of the county court of Scott county—the grand jury of said county found two indictments for perjury against Daniel Dean. These indictments were found upon the testimony of Henry Fugate and Francis Fugate, his father. At the April term the defendant (Dean, the plaintiff in error,) appeared by his attorney and demurred to the indictments. The demurrers were overruled, and the cases continued.
It was further proved that Dean had repeatedly made threats against the Fugates in reference to the prosecution which they had instituted against him for perjury. A witness (Barker) proves that he attended the county court of Scott at the April term. He went to where prisoner was feeding his horses. Witness said to prisoner that he noticed an indictment or two against him on the docket) *919 and said to prisoner, “ How is this, Daniel ? ” To which prisoner replied, “ Them fellows done it.” Witness asked, “Who?” Prisoner replied, “Henry and Francis Fugate, and they have done it through spite.” Witness then said to prisoner, “ I reckon you will get out of it pretty easily.” Prisoner replied, “I reckon so; but I will make some of them pay dear for it.” And witness stated that when prisoner made this remark “ he had the illest and most spiteful appearance that witness ever saw on any one’s countenance.”
Another witness (Marion Fletcher) proves he met prisoner in the road carrying a gun, which he was taking to Cleek’s shop to have repaired. He commenced talking ahout the indictments for perjury, and about the Fugates. Witness said to him, “The Fugates will out you on it, won’t they?” To which prisoner replied that the Fugates could be fixed so that they could not give evidence. Witness understood him to mean, he could set their evidence aside, and replied to him, “ You cannot set their evidence aside, can you?” To which the prisoner answered, “A witness can be fixed so he can’t tell what he knows”; or, “ when the work is done, they can’t tell what they know”; or something of that sort; witness cannot remember which form of expression was used. Witness then understood him, and said, “You wouldn’t do that, would you?” Prisoner replied, “ I will defend myself.” Witness then said, “You had better bend that old gun barrel, or sell her to me.” Prisoner replied, “I will sell her to you for twelve dollars ”; and then rode away.
It was proved by another witness (Reynolds) that at the April term of the county court, 1877, when the court had adjourned for dinner, witness was passing near where Daniel Dean was standing talking with some persons, and heard him say, “Henry Fugate will never be at this trial.”
Another witness (Renfro) proves that he was going *920 home from the April county court, and fell in with prisoner, and they rode together. Witness, referring to the indictments for perjury, asked prisoner if he and Fugate had had their trial. Prisoner said they had not. Witness-said, “It was a pity, as the Fugates were ready, and you say you were ready, and all the witnesses were up ” ; and prisoner replied, “Yes, for the witnesses were nearer all up than they would ever be again ”; or, “ might ever be again ”; witness not remembering which form of expression was used.
There are other witnesses who testify as to feelings of hostility expressed by prisoner against Henry Fugate and his father. But the testimony above referred to is sufficient for our purpose.
Here, then, we find in the prisoner a declared enemy of the murdered man, having a motive to take his life. Indeed, he had a double motive—one of revenge, the other to-prevent a prosecution against him for a criminal offence,, for which, if found guilty, he would have been severely punished. The motive of revenge is indicated by the threats so often made. Doubtless he knew, also—or,, if he did not, no doubt his counsel had informed him—that in a prosecution for perjury, two witnesses were necessary to a conviction. If he could get rid of one of them, he would be safe. This was a powerful motive, superadded to the spirit of revenge, which he manifested, to take the life of Henry Fugate.
The motive, then, being proved which influenced the prisoner, the next question is, Did he have the opportunity to do the deed ? It is proved that the prisoner lived about half a mile from the field where the deceased was shot.. He knew that Fugate was plowing in that field, for the-Saturday evening before he had commenced plowing in> that field, and the prisoner was seen coming from that direction with bark and a gun on his shoulder. He knew, too, that there was a thicket of brushes surrounding that *921 field, from which an assassin could mark his victim unseen. Here, then, we have the motive, the proximity, and the opportunity, all concentrating on the prisoner.
The next question is, Did he have or make preparation for the weapon with which to commit the deed ? Let us see. It is proved by the witness Fletcher, whose evidence is quoted above, that on the occasion when prisoner, talking about the indictments for perjury, said “a witness could be fixed so as he could’nt tell what he knew,” he then, having a gun in his hands, was on his way to Cleek’s shop to have the gun repaired. We find him afterwards with Cleek, the gunsmith. Cleek testifies that at the June term of Scott county court, (which met in the early part June), prisoner left his gun at witness’ house, and asked him if he could fix it. It was a flint-lock gun, and he wanted it changed to a percussion lock. Witness told prisoner he could not fix the gun before the July court next following. Prisoner said he needed his gun, and. wanted it sooner than that; and asked witness if he would pay him part of the money down, would he fix it sooner. Witness told him he would not; but that he would fix it as soon as he could, any way; that prisoner took out his. pocket-book, and paid witness two dollars in money, in part payment for fixing the gun, and gave him one dollar-additional to buy a new lock with. The charge for fixing the gun was five dollars. He further proved that on the Saturday before Fugate was shot, Harris came by witness’' shop, and said that prisoner had told him to get his gun,, if it was done; but the gun had not then been fixed.. Harris proves that on Saturday morning prisoner sent his little boy over to his house, with the request, if he was going to Estillville, to stop at Cleek’s shop, and get his gun; that he did stop for that purpose, and was informed that the gun had not been fixed; that prisoner was at witness’ house about 10 o’clock next morning, Sunday, (the day before Fugate was shot), spent the day with him, and. *922 went to an evening meeting at Pleasant Grove church. While there, asked what Cleek had said about his gun.
Now, while he did not procure this gun, after showing this great anxiety to get it into his possession, he is found in the possession of another gun, just before the fatal day, borrowed by one of his sons from Francisco; which is referred to in the record as the Francisco gun. This gun plays an important part in the bloody drama. It is a gun of peculiar construction, and peculiar bore. It carried a ball of unusual size. It had a square barrel, and while originally it was full stocked—i. e., the stock extending to the end of the barrel—it was now in a half stock, and on the barrel, which was a square rifle-barrel, about three or four inches from the muzzle, there was a loop or staple, being a square piece of iron with a hole in it. Upon search being made around the fence enclosing the field where the deceased was shot, and between which and the field was thick underbrush, there was found an impression ■ upon the ground-where the assassin had evidently been seated, and where there was a slight opening through which the deceased, at the point where lie was shot, could be seen. On the top of a rail at this spot was a distinct impression, as if made by a square rifle barrel, and a peculiar notch made on the edge of the rail. By actual experiment, made by some of the witnesses, the Francisco gun, when laid upon the same rail and drawn back, left a similar square impression and a similar notch, made by the small piece of iron which was fastened to the barrel near the muzzle. There were other circumstances strongly tending to show that the Francisco gun, found in the possession of the pi’isoner, was the gun used in the assassination of Fugate. The ball extracted from his body was weighed, by the physician who extracted it, with a ball taken from the mould of the Francisco gun. They were almost exactly the same weight; the difference being, in the opinion of >the physician, only in the loss of weight occasioned by the *923 ■flattening of the ball in penetrating the body of the deceased. Again, it was proved that upon the examination -of a large number of guns, within a radius of eight miles of the scene of the murder, none were found'of the same •bore, or which would carry precisely the same ball. Two or three only, out of a large number examined, were found which were nearly the same bore and might have carried the same ball as the Francisco gun. But these two or three were accounted for, and proved to be where it was ■impossible the murderer of Fugate could have used them. When this gun was sent for, the prisoner delivered it up, saying it would not shoot; it would not stand cocked. It was proved it had been shot the day before, and that the .prisoner knew it.
There was evidence also tending to show that the lock had been tampered with.
From all this evidence a jury, I think, might fairly infer that the Francisco gun was the weapon used in the murder of Fugate.
How, then, we have in the chain of circumstantial evidence distinctly proved—1st, the motive; 2d, the proximity; 3d, the opportunity; 4th, the weapon with which the murder was committed, traced to the possession of the accused.
The next thing to be considered is, the conduct of the accused. Was his conduct, after the murder, consistent •with that of an innocent man? 1
In all cases of circumstantial evidence the conduct of the accused is always an important factor in the estimate •of the weight of circumstances which point to his guilt. As is said by Mr. Starlde—“ The connection between a man’s conduct and his motives is also one of a moral nature pointed out by experience. It is by their experience of such connections that juries are enabled to infer a man’s motives from his acts, and also to infer what his conduct was from the motive by which he was known to be influenced.” This is especially the case where the corpus da *924 licti has been established by evidence aliunde, as in this; case. See 1 Starkie, 491. Where all the circumstances of time, place, motive, means, opportunity and conduct, concur-in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of his-guilt. See Id. 494.
With this statement of the law of circumstantial evidence, let us now examine the conduct of the accused after-the crime was known. And the first striking fact we have-to notice, is this. There was naturally, in a quiet country community of farmers, great excitement produced by this-secret, unusual, and dreadful crime, when one of their number is shot dead from behind, while plowing in his field, by a hidden foe. Neighbors and persons, far and near,, as the startling news was spread, flocked to the spot, and to the home of the deceased, to aid in the detection of the murderer, or offer sympathy to the stricken family. The prisoner alone, of all the neighbors, did not go either to the scene of the murder, or the home of the deceased. Although he lived within half a mile, near enough to seethe commotion and hear the cries of the afflicted family, and certainly saw the aged father and mother on one horse, hurriedly going to the scene of the murder, yet he neither went himself nor sent any one to enquire what was the matter.
When informed on Tuesday that Fugate was shot, and that he was suspected, he made no remark; he did not then go to the place, or express any surprise or concern in. the matter. When the gun was sent for, he brought out the gun, saying, “ she wont shoot. She wont stand cocked,”' and when asked for the moulds, he said UI had nothing-to do with the gun, nor the moulds either; if the boys-know where the moulds are they can get them.” And yet it is proved that when Francisco delivered the gun to the-prisoner’s son it was in good shooting order;; that it was-shot by his sons on Saturday and. early Monday mornings *925 'the day of the murder; and that the prisoner knew it. When arrested by the party having the warrant of arrest 'issued by a justice, who said, “ Daniel, I am after you”; this reply was, “what is up?” Witness said, “Henry Fugate is dead, and you are suspected of being the man 'that killed him, and I have a warrant for your arrest.” Prisoner’s reply was, “I don’t want to go across the ridge 'there,” meaning the house of Fugate where his corpse lay. Witness asked him if it would suit him to go to another ■place near by; prisoner said it would, and he was taken 'there and a guard placed over him.
While there under guard he made his escape at night, '.fleeing to the mountains without coat or vest or hat or pants, and leaving, beside his garments, twenty dollars in ■money. He was pursued and re-arrested, and tried before ¡a justice. At this trial he then made no defence and was committed to jail. At the trial on indictment for ■murder before the county court, he for the first time offered proof of an alibi; and this was his whole defence. Now the failure unexplained to assert the defence of an alibi when it could first be made, and if true, would be conclusive, is always regarded by the best writers on circumstantial evidence as a most suspicious circumstance.
The creditibility of an alibi is always strengthened, if it be set up at the moment when the accusation is first made ■and be consistently maintained throughout the subsequent proceedings.
Wherever pertinent and material evidence by which an •alibi might, if true, have been supported, is withheld, or is the result of afterthought or contrivance, the attempt to ¡set it up recoils with fatal effect upon the party who asserts it. Wells, 168-170.
Now, in this case the defence of an alibi was not offered till the trial at the county court. It was then attempted to be proved by his two sons. It was manifestly an after thought. If it had been true, how natural that it would *926 have been asserted at the moment of the first charge and' arrest and trial before the justice. If he had informed his--counsel then, it is inconceivable that such a fact should’ have been withheld and the prisoner have been permitted to be sent to jail without defence.
But waiving all these considerati.ons, the question of" whether an alibi was proved was a question of fact for the jury. It is manifest the jury did not believe the evidence-of the two boys, the sons of the prisoner. It was for the-jury, not this court, to judge of their credibility.
Here, then, we have a case of circumstantial evidence,, where time, place, motive, means and conduct concur in pointing out the accused as the perpetrator of the crime.. When these concur, says Mr. StarMe, the evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent. 1 Stark. 494.
In the case before us, this is a pregnant and powerful fact. Here is an humble man, living in the country, with no large number of acquaintances, his daily life limited to-comparatively a narrow circle. Ho human being is suggested as being his enemy. Ho one is found as having a motive to commit the deed. There is no trace or vestige-of any other agent save Daniel Dean. In him we have-all the facts and circumstances concurring and concentrating as the guilty agent. They all point to him, and to-no one else. They all declare that he is the murderer.
There are other circumstances, not alluded to in this-opinion, which of themselves are unimportant, but which all point to the prisoner as the guilty agent. It would protract this opinion to too great length to notice them all.. It is sufficient to say they all point in one direction.
It is hard to conceive of any case of circumstantial evidence more completely made out. We cannot say the evidence is insufficient to warrant the verdict of the jury.. It is sufficient to produce on the mind of every impartial tribunal the moral conviction of the guilt of the prisoner beyond all reasonable doubt.
*927 We are painfully aware that this is a case of purely circumstantial evidence; and we have therefore given to it the most careful and anxious consideration. And looking with the closest scrutiny to all the facts and circumstances J , proved, we find them, when combined, utterly inconsistent with the innocence of the accused, but consistent with no other reasonable hypothesis but that of his guilt.
When these things concur, the force of circumstantial evidence becomes as potent as that of direct evidence.
“ The effect of a body of circumstantial evidence (says Mr. Wills) is sometimes compared to that of a chain,” but the metaphor is obviously inaccurate, since the weakest part of a chain is of necessity the strongest. Such evidence is more aptly compared to a rope made up of many slender filaments twisted together. The rope has strength more than sufficient to bear the stress laid upon it, though no one of the filaments of which it is composed would be sufficient for that purpose.
So, in the case before us, there are circumstances which, taken alone, would not bear the weight of conviction, but when taken together, and considered in their relation to each other, must produce upon the mind a moral certainty of the guilt of the accused beyond all reasonable doubt.
As to the only remaining question, the 3rd assignment of error, as to the inadmissibility of the evidence in relation to the examination of a number of guns in the neighborhood to ascertain whether any of them carried a ball of the same size as that found in the body of the deceased, I think the county court did not err in admitting the evidence. Its weight was a question for the jury. It was admissible as tending to show that the gun in the possession of the prisoner, known in the record as the Francisco gun, was the weapon used in the murder of Fugate,
Upon the whole case, I am of opinion that there is no ' error in the judgment of the circuit court, affirming the judgment of the county court of Scott county, refusing to, set aside the verdict of the jury.
*928 That verdict was fairly rendered, and is supported by the evidence.
This court will not set aside that verdict.
The plaintiff in error must pay the penalty of his dread- ■ ful' crime. That penalty is death, and the judgment must 'be-affirmed.
^Staples and Burks, J’s, concurred.
•Judgment affirmed.