# Staunton

## Thomas Lee Penn v. Commonwealth of Virginia.

September 5, 1969.

Record No. 6969.

Present, All the Justices.

*R. R. Ryder*, for plaintiff in error.

*W. Luke Witt, Assistant Attorney General (Robert Y. Button, Attorney General; Reno S. Harp, III, Assistant Attorney General,* on brief), for defendant in error.

Harrison, J., delivered the opinion of the court.

Thomas Lee Penn seeks a reversal of a sentence of life imprisonment in the State Penitentiary for the murder of Cynthia Johnson. He was convicted by a jury in the Hustings Court of the City of Richmond on December 17, 1966, and judgment on the sentence was accordingly imposed by the trial court.

This is one of a series of cases before us involving defendant and his brother, William Penn. All cases are the subject of opinions this day being announced. While the issue here is a narrow one, it is deemed necessary that the proceedings in the court below, and the facts in the case, be detailed.

Cynthia Johnson was murdered in the City of Richmond on May 9, 1966. Defendant was arrested on May 29th and charged with the crime. At the request of his counsel, a psychiatrist, Dr. William M. Lordi, was appointed on June 15, 1966 by the trial court to examine defendant as to his mental condition. On motion of the Commonwealth's Attorney, a commission of three psychiatrists, Dr. R. Finley Gayle, Dr. Merritt Foster and Dr. Weir Tucker, were appointed on July 22, 1966 by the trial court to conduct a like examination. Defendant, having refused to submit to examination by the commission, or to cooperate with them, was committed to the Central State Hospital for examination by order of court entered September 13, 1966.

After various other proceedings in the court below, defendant was tried on December 15-16-17, 1966, convicted and sentenced as aforesaid. His pleas were not guilty and not guilty by reason of insanity.

About 6:30 P.M. on May 10, 1966, Cynthia Johnson's body was found in a wooded area, in the rear of 1409 North 32nd Street, in the City of Richmond. Detective A. B. Epps described the area as thick with a lot of trees, undergrowth, honeysuckle, etc. Decedent was lying face down. Her clothes had been torn, and her coat was found about 20 paces from the body. The officers found no money, cigarettes, or other identification on the body.

Dr. Geoffrey T. Mann, Chief Medical Examiner for Virginia, testified that the decedent, sixteen years old, died as the result of two gunshot wounds in her right chest. Two bullets were recovered from her body. He noted that the clothes of the decedent had been "torn up rather severely" as if she had been engaged in a struggle.

Oscar E. Henderson testified that he had dated Cynthia Johnson and had been with her from about 2 or 3 o'clock in the afternoon of Sunday, May 8th, until about 11 or 11:30 that evening. He gave her a package of Marlboro cigarettes and about 90 cents in change. When he last saw the decedent they were at the corner of 25th and Venable Streets, and, following an argument between the two, she left going in the direction of 26th and Q. Streets.

Johnnie Mae Hicks, age fifteen, testified that the first time she ever saw Thomas Lee Penn was on May 22, 1966, at or near a friend's house at 2019 North 29th Street. She stated that the time was close to 11 P.M., and that she and her boyfriend had been fighting when Penn walked up and told her that he was a detective. Defendant asked Johnnie Mae Hicks if this man (referring to her boyfriend) was bothering her. She replied that he was and that she was going to call

the police. Penn responded by telling her that his mother had already called them. At this point the boyfriend, Eugene Willis, went into the house to get a companion, a man named Purcell. Johnnie Mae Hicks stated that Penn ran with her around a field; that when they got there Willis and Purcell came out of the house and climbed across a fence looking for them; that Penn shot at Willis three times; and that he (Penn) ran. Willis then walked her home and left her at the door.

After that episode this witness reconsidered calling the police and had started towards a phone booth when she saw defendant again on the side of "the ice cream house". Penn walked with the Hicks girl to the phone booth, but convinced her that if she made the call there would be a lot of trouble. The two then went back to the girl's home and at this point she said that Penn suggested that she go back and call the police because Willis might come around and start some disturbance. En route back to the phone booth, and upon seeing an automobile which they thought belonged to Willis, Penn suggested running around another way instead of going straight. This way took them across the street and in a field. There defendant told the Hicks girl that she "was going with him". He told her to take off her clothes.

While there in the field, defendant asked her if she read the newspapers and "if she had read about Cynthia". Witness responded that she had read about her, and testified that Penn then said, " . . . I kill her and two mens in the cemetery". The witness also testified that Penn " . . . told me that Cynthia had died in darkness but I would die in the light". The area, although wooded, was lighted with street lights. Penn then shot Johnnie Mae Hicks. She described the weapon as a short black pistol with a white pearl handle that had ridges on it.

The Commonwealth then called Sergeant C. L. Brown, Detective Harry W. Duke and Detective Alvin B. Epps of the Richmond City Police Department, who testified regarding the surrender of defendant on May 29, 1966, and of the circumstances surrounding the confession that he made to the police officers on that day. Their testimony will be hereinafter discussed.

The confession[1] of defendant was introduced and in it he admits

---

[1] "In the presence of Detectives A. B. Epps and H. W. Duke, I am making the following statement:

"Cynthia Johnson. I followed her down Q Street. I caught up with her and asked her where she was going. She said she was going home. I walked with her one-half block home. That is when I put the gun on her. I told her that she had to go. She

that he shot and killed Cynthia Johnson in "Armstrong's woods, dead man's canyon". Penn said that after he shot her, and while she was down, she asked for some air to breathe so he pulled her coat off and left her. He admits to stealing her house key, a pack of Marlboros and a scarf. Defendant stated to Detective Epps that he had disposed of the gun that he used by throwing it in a storm sewer in Washington, D. C.

didn't resist at first. There was a man walking up the street toward us and she tried to break a loose. The man started toward us. When he saw the gun in my hand, he went the other way. I took her behind Armstrong woods (dead man's canyon). I believe I shot her nine times. While she was down, she asked for some air to breathe so I pulled her coat off her and left her and I went home with all of her identification. I burned them as I did the others.

"Q—Which gun did you use to kill Cynthia?

"A—Black—Pearl handle.

"Q—Is this one of the guns that you have disposed of?

"A—Yes.

"Q—Did you get any money from Cynthia?

"A—No. She had her house key and a pack of Marlboros and a small black scarf.

"Q—Did you know Cynthia before this incident?

"A—No.

"At this time, the accused was asked if he wanted a cold drink or cigarettes or anything: He asked for a pack of Salem cigarettes, which were brought to him, and he wished to continue the confession.

"Q—Did you attempt to sexually molest Cynthia?

"A—No.

"Q—Do you know why you shot her?

"A—Not really.

"Q—Did she provoke you in any manner?

"A—No, she didn't.

"Q—Did you tell her anything before you shot her?

"A—Yes. I told her it was her time to go—God had called her.

"Q—Did you tell her anything else?

"A—I let her talk and I listened to her.

"Q—What did she say?

"A—She talked about her stepfather and boyfriend. She said her stepfather tried to beat her. So I told her this was the best way out.

"Q—Did you fight with her?

"A—I didn't struggle with her.

"Q—What time did you shoot her?

"A—I can't remember about the time. It was pretty close to 12:00 o'clock at night.

"Q—What were you wearing?

"A—A pair of light grey dress pants, light green banlon shirt. Then I went home.

"I have read the above confession and it is true to the best of my knowledge and belief. I can read and write.

"/S/ *Thomas L. Penn*

"WITNESSES:

"/S/ *Det. P. E. Hastings*

"/S/ *Det. R. E. Wright*

"/S/ *Det. A. B. Epps*"

At the conclusion of the evidence for the Commonwealth, defendant called Dr. William M. Lordi to testify. Dr. Lordi first saw defendant in 1962 at the Memorial Guidance Clinic. At that time defendant was referred to the clinic by the court "for being beyond parental control", and the authorities were concerned about his mental health. Dr. Lordi said defendant came to the clinic for psychiatric evaluation and for a social history, with his mother, and also for a psychological examination. He stated that he felt defendant "was a paranoid schizophrenic" and referred him to Central State Hospital for further study and treatment.

Dr. Lordi next saw Penn during July, 1966 and subjected him to a battery of tests, described as " . . . projective tests, tests for intelligence, tests for the presence or absence of brain problems, tests to help us get a picture of what was going on underneath the surface psychologically, also electroencephalogram and neurological examination". The doctor said he felt Penn "still is a paranoid schizophrenic", and in his opinion was "extremely ill mentally" and did not know right from wrong.

The Commonwealth, in rebuttal, examined Dr. L. E. Kervin, a psychiatrist, who is the Assistant Superintendent of Eastern State Hospital, and Dr. Emilio F. Montero, a psychiatrist, who is the Clinical Director of the Criminal Building of the Central State Hospital. These two doctors had Penn for observation and examination for approximately 41 days pursuant to order of court entered September 13, 1966.

In brief, they testified that defendant was subjected to all the usual tests and examinations given and made to determine a patient's mental and physical condition. The electric encephalogram showed no organic damage to Penn's brain. The psychological test revealed no mental disturbance or mental illness of any type. His I.Q. tested at a full scale of 103, which indicates that defendant functions in the normal range of intelligence. Their conclusion, stated separately, was that defendant was neither mentally ill nor mentally defective and was able to distinguish right from wrong. They saw no evidence to indicate that defendant acted on an "irresistible impulse".

Defendant, who is nineteen years old, was called by his counsel as a witness in his own behalf and testified at length. His counsel developed the fact that defendant is the product of a broken home, his father having abandoned his mother for another woman when defendant was a very young boy. It was established that defendant was raised in a home where violence, discord and insecurity prevailed.

The family has been in and out of numerous courts with their various domestic difficulties, and all members have been embroiled with the law. Defendant's career includes the 1962 confinement in Central State Hospital, following his apprehension or arrest by the juvenile authorities of the City of Richmond for truancy and being beyond parental control.

While on the witness stand, defendant admitted that he shot Cynthia Johnson and stole from her a pack of Marlboro cigarettes, a key chain and some change, and left her body in the woods. He also testified to shooting Johnnie Mae Hicks about 5 times and writing "sniper twenty" on her. His testimony regarding the circumstances of meeting the Hicks girl, the conversations, the other parties involved in the episode, and the locale, were entirely consistent with the circumstances as detailed by her.

Defendant was asked by his attorney how many people he had killed, and he responded: "Six by myself. . . . That was this year." He thought that the killings took place between February and May. Defendant detailed his various killings as follows:

(1) Moselle Spencer, at the Eggleston Motel. He robbed the victim of something over $70. Penn said that when he killed Spencer he was using a stolen automobile.

(2) James Horace Carter, Sr. Defendant had previously worked with this man and knew him. He persuaded Carter to drive him to an abandoned farm house where he killed him. Penn then stole from him $40, his personal belongings, groceries that Carter had purchased, and the victim's automobile, which he later burned.

(3) Willie Sexton. After killing this man, Penn admits that he took his money (only a few dollars), his personal belongings, and dumped his body in Chickahominy Creek.

(4) Cynthia Johnson.

(5) Addison E. Wilkins, who was identified as a conscientious objector. From this man Penn stole approximately $11 and his personal belongings.

(6) Malcomb Lynn Norment, Jr. was identified as "the man on Broad Street who was tall and slender". This man was shot 10 times by Penn and $11 was stolen from him.

Two of the victims were killed the same night. Defendant admitted that he had two pistols and used both on several of the victims.

This case was heard by a jury. Their verdict of conviction has been approved by the trial court. The conflicts in evidence have been

resolved by the jury against defendant. In fact, the only conflict is between the testimony of Dr. Lordi on behalf of defendant, and Doctors Kervin and Montero on behalf of the Commonwealth.

The only error assigned by defendant is to the action of the trial court in admitting the confession made by him to the police officers on May 29, 1966.

The defendant relies upon *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966) in seeking a reversal of his conviction. Since this case was decided, it has been the subject of thousands of decisions, law review articles, speeches, editorials, as well as prompting action by the Congress of the United States. The holding of the court there was spelled out with specificity. Mr. Chief Justice Warren states it briefly as follows:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.* If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. . . ." (Italics supplied.)  384 U. S. 436, 444, 445, 86 S. Ct. 1602, 1612.

Admittedly Penn was in custody when he confessed to the murder of Cynthia Johnson. Admittedly Penn was given the constitutional warnings as prescribed in *Miranda* before he was questioned and

before he confessed. The sole question we have to decide is whether defendant waived his right to the presence of an attorney, either retained or appointed, at the time he confessed and *if such waiver and confession were made voluntarily, knowingly and intelligently*. If so, the confession is admissible. If not, the trial court erred in admitting it, and defendant should be granted a new trial. We therefore have before us a question of fact, and further comment on the evidence is indicated.

The Commonwealth must concede that Penn was raised and grew up under depraved and deprived conditions. We can speculate that this background and environment may have contributed to his delinquencies as an adolescent, and to his career of crime. However, irrespective of defendant's past history, the record shows that we are not here dealing with an illiterate person, or with one who is suffering from a mental illness, or who is unable to discern right from wrong. The physicians, who had this man under observation over a period of time, testified that he had an average I. Q. and functioned in the normal range of intelligence. They were most positive in their testimony that he had no type of mental illness or mental defect.

Defendant completed nine grades in school. This means that he had graduated from elementary school and had completed two years of high school work. This is obvious from his testimony and from his confession. It abounds with such words as "disrepectful", "accidentally", "respect", "foster home", "coping". He speaks of "paying his last respect to the dead"; "psychiatric help"; "committed to Central State"; "news bulletin"; "resent"; "made a reservation"; "probably could estimate"; "solitary confinement"; "interrogation room"; "abandoned farm".

When asked by his attorney if he knew what the word "reject" means, Penn responded, "draw away from", and then went on to say that "his father had [rejected him] but his mother had stuck by him". The vocabulary of this man, and his sentence structure, demonstrate that we have before us an individual of average intelligence, certainly of the intelligence that would normally be expected of a person who has completed nine years of public schooling. The jury concluded that this man was sane. The evidence of the two psychiatrists who had the best opportunity to observe, examine and evaluate him was to that effect.

For further corroboration, we again go to the record. Penn's answers, when examined by his counsel, and on cross-examination, were

clear, lucid and in detail. They are consistent with known facts and testimony given by unimpeachable witnesses. His memory as to dates, street addresses and the details of his crimes is good.

Defendant's ability to follow instructions was demonstrated. The trial court appointed three eminent psychiatrists to examine defendant as to his mental condition—a procedure provided for by the laws of Virginia. He was advised by his attorney not to respond to questions and not to cooperate. He followed these instructions meticulously and the psychiatrists were unable to make the examination.

Dr. Kervin testified that he never saw defendant when he was "out of contact with reality". He said that Penn was evasive " . . . when he is told to be, he is able to carry on a normal conversation when he wants to". When asked to explain that statement and say what it was based upon, Dr. Kervin responded: "He co-operated fine in all interviews with me, answering every question I asked him, except where he told me he was instructed by his attorney not to talk." Penn had been instructed by his counsel not to talk about any of the criminal activities of which he was suspected, and he refused to do so with the doctors.

It is to be noted that after he killed Cynthia Johnson, Penn removed her identification and burned all evidence. This made it more difficult for the officers to investigate the crime or to apprehend the person responsible for it. In addition, Penn disposed of the murder weapon in a distant city and in a place where it was least likely to be recovered.

All of these actions negate the argument that he is a mentally disturbed individual, killing under irresistible impulses. Rather they show a cleverly designed method of killing and concealment. From each victim he stole something of value and thereby profited by his act.

Pertinent also to the issue of the voluntariness of the confession is the fact that defendant was not a stranger to law enforcement officers, to police, to jails, to courts and to attorneys. Penn refers to an attorney as "counsel".

This background becomes important when we consider the events of May 29, 1966, the day on which Penn confessed to killing Cynthia Johnson and five others, and the attempted murder of Johnnie Mae Hicks.

The record shows that Penn had gone to Washington, presumably to dispose of the murder weapon. While there he says he learned that the police were looking for him. His testimony was:

"A. I was looking at television, the news bulletin came out and

reporter on there, news reporter, say we have a warrant for the arrest of Thomas Lee Penn, nineteen year old youth."

At about 7:30 A.M. on May 29, 1966, defendant, together with his brother, William, and his father, appeared at a Richmond police station and surrendered. Detective Sergeant C. L. Brown testified that at that time he talked to Penn for approximately 15 minutes. Brown advised him of his constitutional rights. Penn's statement then, according to Brown, was as follows:

"A. He said that he did not want to make a statement, that he wanted counsel and that his father had told him that he was going to employ counsel and he wanted to abide whatever the coun—his counsel told him, that he didn't care to make a statement relative to anything."

Brown was asked if they tried to contact his father, and he responded:

"A. Not right at that time, you see, at that time his father had just left, I understand, had just left the building, his father came with him up there, . . . and right at that time we did not, that was in the morning, early around 7:30 or eight o'clock."

Following this exchange no interrogation of Penn was conducted. About the middle of the day the following occurred, according to Sergeant Brown:

"A. In the middle of the day, approximately one or one-thirty, we came—after conducting other investigations outside, we came back to Police Headquarters and I went back to the lockup and I asked him had his father sent an attorney up there and he said no, I asked him did he want to call his father again, he said no, not at that time. I asked him, I said do you want us to contact Judge Maurice to see if he will appoint a lawyer for you and he didn't want us to do that either. We asked him did he want anything, like a sandwich or cold drink or anything we could do for him."

No questions were asked Penn at this time—the middle of the day— and Penn made no statement other than the fact that his father had

not employed counsel for him. The record shows that the conversation between Brown and Penn took 3 or 4 minutes and that Penn was not taken to an interrogation room. The conversation occurred in the lockup. Sergeant Brown did not again see or have any conversation with Penn until about 8:30 or 9 o'clock that night.

Detective A. B. Epps saw defendant in the interview room around 9 A.M. After advising him of his rights, Epps testified:

" . . . I asked him could I ask him a question, and he said yes, and I asked him was he in the Fulton area in a gray automobile and his answer was yes, he was in the car, a '58 gray Chevrolet with a friend of his, some nickname that he called, that we have been unable to locate, and I told him that we would try to find the party if this was a witness of his, we wanted to clarify that angle too."

Epps also said that he asked Penn if he desired to make a telephone call and Penn answered he wanted to talk to his father. He said his father was working at Johnston-Willis Hospital. Epps testified: "I dialed the number myself, got his father to the 'phone and he talked with his father at length." This is all that transpired between Penn and Detective Epps. The latter did not see Penn again prior to the time of the confession.

At about 8:30 or 9 P.M. Penn was brought into the interrogation room by the officers, and we again refer to Sergeant Brown's testimony for what then transpired:

"Q. And so—and you advised him then of the rights.
"A. Yea.
"Q. which you have enumerated. All right, what if anything happened then?
"A. Well, he decided that he wanted to make a statement without an attorney being there and so we told him—he started to tell about it, and we said well, it's no use of going over all of this until we have a stenographer, so we—about that time Mr.—Detective Hastings and Wright came in and they came to the door where we were talking, in fact the door was setting open, because it's such a small room, we just had the door propped open, and they wanted to see us, and so I talked with them outside, and so they had in their possession a twenty-two calibre revolver and said that they had found it in a washing machine over at Thomas' brother's home on 15th Street, in South Richmond, William Penn. So I told him about

this revolver, and asked him did he know anything about it, and he didn't believe, you know, that we had a revolver, at least, 'I don't know whether you got a revolver from over there or not', I hadn't showed it to him then. So we said suppose we tell you the serial number of it, well, he said, 'well, I don't know whether you got a revolver from over there or not,' he didn't believe it or he wouldn't tell us whether he believed it. So we brought the revolver and laid it on the table and he examined it, and he appeared to believe—he believed it then, in other words, he appeared to believe that we had —that Hastings had got the revolver from over at his brother's place. Of course, he said it was his brother's gun, William's gun.

"Q. Uh huh. All right, now, did he make a statement to you at that time?

"A. No, sir, we went out and left Hastings and Wright back there, we went to try to obtain the services of a stenographer. So we called our girl that works in our office, Mrs. Neal, and couldn't locate her and sent a car looking for her, and then we called Mrs. Shackelford, who is a Secretary to the Captain up at the Mosque, and finally she was brought down and while we was waiting for her, we just went back where he was, but we didn't go into any details about any of these crimes, we just sit around, a little small talk, asked him what he was doing and what part of town he was staying in and stuff like that, it wasn't relative to these—

"Q. I see?

"A. kinda small talk, I reckon you would call it.

"Q. Were there any promises made to him for leniency if he would make a statement?

"A. I never made him any promises and I never heard any of the other officers in my presence make any.

"Q. Was any coercion or threat of violence made to—

"A. No coercion, threats—"

Penn then gave a full and complete confession or statement and responded to certain questions that were asked him by the officers. The original statement (which was edited for the purposes of the instant trial to that part which concerned only the murder of Cynthia Johnson) is filed as an exhibit with the record. It reflects that periodically Penn was asked if he desired to stop or if he wanted food, drinks, or to go to the men's room.

On cross examination the following exchange occurred between counsel for Penn and the witness Brown:

"Q. Now, then, subsequent to that conversation, how many police officers talked to him?

"A. Well, from that time until I went in there in the middle of the day, I don't know whether anybody talked to him or not, to my knowledge no one.

"Q. What time did you go in in the middle of the day?

"A. Approximately one or one-thirty P.M.

"Q. Now, at that time, did you endeavor to question the defendant concerning his participation in these crimes?

"A. No, sir.

"Q. What did you question him about?

"A. I didn't question him about anything.

"Q. Did you have any conversation with him at all?

"A. Yes, sir.

"Q. What did you ask him, sir?

"A. I asked him had his father sent an attorney to see him, he said no. I asked him did he want me to call his father again, he said no. I asked him did he want me to contact Judge Maurice relative to appointing an attorney to represent him, he said he did not. I asked him did he want anything like a sandwich or a cold drink or a pack of cigarettes.

"Q. Up to this time and up to ten o'clock, when he first admitted participating in any criminal activities, had he ever told you 'I do not want an attorney'?

"A. Not until that night around 8:30 or nine o'clock.

"Q. That night did he tell you I do not want an attorney?

"A. Yea, he said he wanted to give a statement, he didn't need an attorney, he didn't say he didn't want one in Court or anything, but he said I'm willing to make a statement without an attorney being present.

"Q. What time did he tell you 'I do not want an attorney'?

"A. I didn't write down exact—

"Q. Approximately, sir?

"A. Approximately, I'll say between 8:30 and 9:30 P.M., on the 29th of May, 1966."

Detective Harry W. Duke testified that he was present with Sergeant Brown on the various occasions when Penn was seen during May 29th. His testimony was substantially the same as that of Brown and to the effect that they did not question Penn for the reason that

defendant " . . . stated he thought his father was going to employ counsel for him. He called it counsel".

Sergeant Duke was asked by counsel for Penn when he first ascertained that defendant had a history of mental illness. He responded:

"A. I believe that sometime after—or sometime during the night of May the 29th when we were talking with him, after he had stated that he wanted to give us a confession, as he called it, and did not want the benefit of counsel, that he knew he was entitled to it, but he did not want the benefit of counsel. I think sometime during our discussion then he told us that he had been to Central State Hospital."

The events of May 29th, as they relate to the confession, can therefore be summarized as follows: Defendant surrenders himself to the police officers in the early morning. He is then, and repeatedly thereafter, fully advised of his constitutional rights. Understandably the Richmond police officers were anxious to question Penn whom they suspected of having committed a series of murders in that city. However, the record shows that he was not interrogated, for when they first asked him if he would make a statement, defendant was under the impression that his father was going to get a lawyer for him. Defendant never stated on May 29th that he was going to employ an attorney, or that he wanted the court to appoint an attorney for him.

This man was not held incommunicado or denied contact with his family or friends. He came to the station voluntarily and with his father and brother. He was permitted to have a lengthy telephone conversation with his father during the mid-morning of May 29th. What these two discussed, and whether or not the father then told defendant that he was not going to get a lawyer for him, is not known.

In the middle of the day when asked if his father had gotten the lawyer, defendant said no. When he was asked if he wanted to call his father again, he said no. When asked if he wanted the police officers to have Judge Maurice of the Richmond Police Court appoint an attorney to represent him, he said he did not. There was then no interrogation of defendant and no other questions were asked him.

Nothing further occurred until about 8:30 P.M. on the 29th. It was then that defendant decided that he should make a statement or confession. Whether this was prompted by the telephone conversation that he had with his father, by sight of the pistol found in his

brother's home, or by qualms of conscience, or by a decision that he did not need an attorney, is not known. We do know from the testimony of Detective Duke that Penn stated that he wanted to give the police officers a confession and that he did not want the benefit of counsel although he knew that he was entitled to it. This corroborated the testimony of Detective Sergeant Brown.

The evidence in this case is amply sufficient to show that Cynthia Johnson was killed within the city limits of Richmond on May 9, 1966; that she died as the result of bullet wounds and following a violent struggle; that subsequent thereto, on May 22, 1966, defendant, Thomas Lee Penn, made an unsuccessful attempt to murder Johnnie Mae Hicks and during the course of the attempt made a statement that he (defendant Penn) killed Cynthia Johnson, detailing the manner in which she died; that on May 29th, defendant confessed to the murder of Cynthia Johnson and in his confession corroborated the testimony of Johnnie Mae Hicks as to the manner in which the murder occurred; and that defendant in open court and under oath, when testifying in his own behalf, admitted murdering Cynthia Johnson, his testimony being consistent with his confession and the testimony of Miss Hicks. The sanity of defendant was established by the testimony of experts in mental diseases and otherwise is reflected by the evidence.

We find no error in the action of the court admitting in evidence the confession of defendant. True, at one time defendant thought that possibly his father was going to employ an attorney for him but such employment did not materialize. Defendant made no incriminatory statement during the time that he was awaiting employment of an attorney by his father. He made no effort to employ an attorney, and he rejected the offer of the officers to have the court appoint one for him.

If the testimony of Detective Sergeant Brown and Detective Duke is to be believed, and there is nothing in the record to contradict them or to impugn their character, reputation or veracity, defendant concluded that he did not desire or need the services of an attorney and confessed to the murder of Cynthia Johnson. This confession was made voluntarily, knowingly, and intelligently. It was not coerced and it was not made as the result of any threats or promises. Defendant had not been subjected to any physical or mental oppression and had not been previously subjected to any interrogation or grilling by police officers. He had not been held incommunicado and had

been given free access to his family and to the telephone. His physical needs had been met. There is not one scintilla of evidence in this record to establish, or even intimate, that the police officers did not accord defendant Penn his every constitutional right.

To hold the confession inadmissible under the facts and circumstances of this case would in effect say that once a defendant intimates that he or someone might employ an attorney to represent him, he will not thereafter be permitted to confess, or make any statement, unless and until such an attorney is employed or appointed—this irrespective of the fact that the defendant voluntarily, knowingly and intelligently waives his right to the presence of counsel. We do not believe that *Miranda* will be so extended, or that such was the intent of the Supreme Court. The judgment of the lower court is

*Affirmed.*