# Staunton

## Thomas Lee Penn v. Commonwealth of Virginia.

September 5, 1969.

Record Nos. 6970 and 6971.

Present, All the Justices.

*Richard R. Ryder*, for plaintiff in error in Record Nos. 6970 and 6971.

*W. Luke Witt, Assistant Attorney General (Robert Y. Button, Attorney General; Reno S. Harp, III, Assistant Attorney General*, on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

These are the second and third of companion cases, today decided by this court, styled *Penn* v. *Commonwealth*.

Thomas Lee Penn was indicted separately for the murders of Addison E. Wilkins and Malcomb Lynn Norment, Jr. At a jury trial had on both indictments, with the consent of defendant, on April 17-18, 1967, he was found guilty and given life sentences. Judgments on

the sentences were accordingly imposed by the lower court. He appeals from his convictions, assigning as the sole error the action of the lower court in "admitting into evidence certain statements in the nature of confessions made by defendant, as such statements were obtained in violation of defendant's constitutional rights".

The background, education and mental condition of defendant, as well as the circumstances under which the May 29, 1966 statement was made to the police, have been discussed in detail in the opinion of this court in the first companion case. *Penn* v. *Commonwealth*, 210 Va. 213, 169 S. E. 2d 409 (1969).

Addison E. Wilkins and Malcomb Lynn Norment, Jr. were murdered in the City of Richmond on May 21, 1966. Detective H. W. Duke, of the Bureau of Police of the City of Richmond, located their bodies on the south edge of the roadbed of the 3600 block of East Richmond Road near Oakwood Cemetery. At that time, the place where the bodies were found was being excavated for an apartment building. The officer found no identification or money on either body. The pockets of the victims had been turned wrongside outwards.

Dr. Geoffrey T. Mann, Chief Medical Examiner for Virginia, testified that Wilkins, 20 years old, had been shot 10 times with what he believed to be a .22 calibre pistol, 5 of the shots having been in the back of the head. He said the decedent died as the result of these gunshot wounds.

Dr. Gordon E. Madge, Assistant Medical Examiner for Virginia, testified that Norment died as the result of multiple gunshot wounds which he described as 2 in the chest, 2 in the back of the head, 2 in the back, and 1 on the right side of the face.

The Commonwealth then sought to introduce into evidence statements given by defendant Penn on May 29, 1966 and May 31, 1966. The evidence of Detective Harry W. Duke and Detective C. L. Brown, taken out of the presence of the jury touching on their admissibility, was substantially the same as is set forth in the opinion of this court in *Penn* v. *Commonwealth, supra*. It will be hereinafter discussed. The trial court admitted into evidence so much of the statements as relates to the murders of Wilkins and Norment. Defendant objected and excepted to this action.

In the statement of May 29th,[1] defendant admitted that he shot and

* * *

[1] "In the presence of Detectives H. W. Duke and R. E. Wright, I am making the following statement:

killed Wilkins. At the time he did not know his victim's name, but identified him as a "conscientious objector", and as a man of medium height who wore eyeglasses and had on dark clothing. (Defendant had read in the newspapers that the man was a conscientious objector.) He met Wilkins about Forest Hill Avenue and asked the decedent to show him to Laburnum Avenue. Defendant said that he took Wilkins down by the cemetery "right up where they were cleaning up the ground". Penn feigned trouble with the accelerator of his car, opened the door and asked Wilkins out. He told him he " . . . was going to send him to a resting place, then . . . shot him, . . . [and] put him in the area that they were digging up".

"The fifth one was the conscientious objector.
"Q—Do you know his name?
"A—No.
"Q—Can you tell us what he looked like?
"A—Medium height—wore eyeglasses.
"Q—What type eyeglasses?
"A—I don't know. I know they had black frames.
"Q—Do you know the type of clothing he was wearing on this particular night?
"A—Dark clothing.
"Q—How do you know that this man was a conscientious objector?
"A—I read it in the newspapers.
"Q—Did you call this man prior to meeting him on this particular night?
"A—No. I met him about Forest Hill. I asked him if he could show me Laburnum Avenue. He said he could. I took him all the way down by the cemetery right up where they were cleaning up the ground. I told him something was the matter with my accelerator and I stopped. I got out, walked around to his door, opened the door, and asked him out. He asked me what I was going to do. I told him I was going to send him to a resting place. Then I shot him. I put him in the area that they were digging up. I left him and went over town. I was coming back down West Broad Street and I saw another fellow and asked him if he was going to the Bus Station. He said he was and I told him I would take him there. Instead, I took him to the same place where I took the conscientious objector. I got out of the car and asked him out and shot him. He grabbed his heart and mumbled something. Then I put him down near the other body.
"At 11:45 P.M. accused was asked if he wanted to go to men's room of [sic] he wanted anything to eat and if he wanted to stop or finish the confession. Accused wished to finish the confession.
"A—I then left and went home.
"Q—Can you estimate how many times you shot the conscientious objector.
"A—About from 10 to 12 times.
"Q—What gun or guns did you use to shoot the conscientious objector?
"A—The same two I used on Mr. Carter.
"Q—What type of gun was this?
"A—Two .22's caliber guns.
"Q—Were these pistols or rifles?
"A—Pistols.
"Q—Did you take any personal belongings off of the conscientious objector?

Penn then returned to West Broad Street where he saw Norment, identifying him as "this other fellow", and offered to take him to the

"A—I took his watch and identification.
"Q—What did you do with these?
"A—Burned his identification and broke his watch up because I already had one.
"Q—What did you do with the watch after you broke it up?
"A—Put it in the trash in my house.
"Q—Where was your house?
"A—1201 North 26th Street.
"Q—How much money did you get off the conscientious objector?
"A—$11.00 because he couldn't spend any of it.
"Q—When he got out of the car, did he start running before you shot him or how did you shoot him?
"A—He started to run and I shot him in the back of his head.
"Q—What did you do with the money that you took from his pocket?
"A—Spent it in a useful way.
"Q—Can you describe the second man that you left out there with the conscientious objector?
"A—He was a tall man and slender.
"Q—How was he dressed?
"A—He was also dressed in dark clothes.
"Q—Can you estimate how many times you shot him?
"A—About ten times.
"Q—What weapons did you use to shoot him?
"A—The two guns that I disposed of.
"Q—Did you take the identification off of this man also?
"A—Yes, I did.
"Q—Did you take any money off of this man?
"A—He had $11.00 also.
"Q—What did you do with his identification.
"A—Burned it.
"Q—Where did you burn it?
"A—In my heater.
"Q—At what address?
"A—1201 No. 26th Street.
"Q—What did you do with the money?
"A—Spent it in the same way I spent the other $11.00.
"Q—Approximately what time was it when you killed the conscientious objector?
"A—Pretty close to dawn.
"Q—Approximately what time did you kill the other man?
"A—About one-half difference.
"Q—Approximately what time did you pick the man up whom you described as the conscientious objector?
"A—I don't know. It was after 12:00 o'clock at night.
"Q—Whose car did you have when you picked these men up?
"A—Mr. Carter's car.
"Q—Where did you get your pistols from?
"A—I stole them.
"Q—Did you steal them in Richmond?
"A—Yes.

bus station. Instead, he took Norment out to the same excavation spot near the cemetery where he had killed Wilkins, required him to get out of the car and then shot him. Defendant says that Norment "grabbed his heart and mumbled something, then I put him down near the other body".

Defendant shot Wilkins about 10 to 12 times, using two .22 calibre pistols, and he took his watch, identification and $11. He burned the identification, broke the watch up "because I already had one" and spent the money "in a useful way". He also stated that he shot decedent in the back of the head while he was running away.

Defendant shot Norment 10 times with the same two guns, and removed all identification from the decedent which he burned in a

"Q—Were these pistols stolen from parked automobiles, homes or business places?
"A—Business places.
"Q—Did you break in these places to steal these?
"A—No, they were already open during the business hours.
"Q—In other words, you shoplifted them?
"A—Yes, sir. I walked behind the counter and got them.
"Q—Do you know what place you got them from?
"A—That I can't remember, but I know I stole them.
"Q—Where did you get your ammunition from?
"A—I bought it.
"Q—Where did you buy most of it from?
"A—Places out of town.
"Q—Did you take the money off of the people that you killed to buy your ammunition?
"A—I spent some of the money to buy some ammunition with. The rest of it I bought gas for the cars. I know I spent 79 cents and bought a cross. I lost it.
"Q—What were you going to do with the cross?
"A—Keep it to pray with.
"Q—Do you know the exact location on Broad Street that you picked up the second man that you left on E. Richmond Road?
"A—No, I don't.
"Q—Did you have any struggle with any of your victims?
"A—Only one. That was Cynthia. She tried to break loose when the man was walking toward us down the street.
"Q—Did you know your victims before you shot them? Had you ever seen them before?
"A—No, except for Mr. Carter.
"Q—Why did you take the second man to the same spot that you had taken the conscientious objector?
"A—I thought about the other fellow and put him where he was.
"Q—Were you angry?
"A—No, I was not angry.
"Q—Why did you kill these people?
"A—I don't know.
"Q—Did you get a thrill or any sexual satisfaction from killing these people.
"A—After I had done it, I knew something must have been wrong with me."

heater in his home. He took $11 from this victim and "spent it in the same way that I spent the other eleven dollars". This is the essence of the statement made by defendant to the officers on May 29, 1966.

Detective Duke testified that on May 31st, defendant gave an additional statement.[2] It is substantially the same as the one given on May 29, 1966, except that in the latter defendant implicated his brother, William Penn, as having been an active participant in the murders of both Wilkins and Norment, as well as those of Mozelle Spencer, Willie Sexton and James Horace Carter, Sr. Defendant admitted shooting both Wilkins and Norment, but in the May 31 statement said that his brother, William, also shot the two victims, shared in the money that was stolen from the bodies, and drove the Carter vehicle used at the time.

---

[2] "I, Thomas Lee Penn, colored male, age 19, 27 Louisiana Street, wish to make an additional statement, to Sergeant C. L. Brown and Detective H. W. Duke, concerning the involvement of my brother, William Penn, in the cases of Reverend Mozelle L. Spencer, Willie Sexton, James Horace Carter, Sr., Malcomb Norment, Jr., and Addison E. Wilkins. I realize that any statements that I may voluntarily make may be used in court and that I am entitled to counsel but I am willing to give you my statements at this time without the benefit of counsel. I am making the following statements of my own free will without any threats or promises of any reward. I have been fed and I have not been mistreated in any manner since my arrest at 6:30 A. M., May 29, 1966.

\* \* \*

"Went over near Forest Hill Avenue. My brother told me we were going to get another one. I saw someone walking down on the side the same direction we were going. I told William. William pulled up beside them. I called him to the car. William asked him to show him Laburnum Avenue. He said he was going to a club. That was the conscientious objector.

"So he told William he would show him where Laburnum Avenue was and asked William was he going to bring him back. William told him yes. He showed us where Laburnum Avenue was and asked William did he know where the club was located. William told him yes, it was a little further down. I don't know whether he turned off or not. Anyway we came to a place where they were digging up the ground. William stopped the car. The conscientious objector asked me what were we going to do. I told him I was going to send him to a resting place. I got out the car and asked him out. Then William got out. We walked off the road into the place where they were digging up the ground. I had my gun on him standing behind him. My brother, William walked up and shot him in his head. And I looked at my brother. Then I shot him.

"Q. How many times did William shoot the man?

"A. Six.

"Q. How many times did you shoot the man?

"A. I don't know. I believe it was six. I'm not sure.

"Q. What guns were used to shoot the conscientious objector?

"A. Black pearl handle, 22 caliber, and my brother gun.

"Q. When you refer to your brothers gun, do you mean the gun the police are now holding?

When defendant was arraigned, he entered pleas of not guilty and not guilty by reason of insanity. In support of this defense, he called Dr. William M. Lordi, a psychiatrist, and in rebuttal, the Commonwealth called Doctors Emilio F. Montero and Leo E. Kervin, Jr., psychiatrists. Their testimony relative to the mental condition of defendant was the same as in *Penn* v. *Commonwealth, supra.*

Dr. Lordi testified again that he concluded in 1962 that defendant was psychotic and diagnosed him as a paranoid schizophrenic. He said that when he saw him in 1966 it was his feeling, or opinion, that defendant "had deteriorated considerably, intellectually, emotionally and in terms of being more disturbed psychiatrically". In his opinion defendant's psychotic act of killing in May, 1966 was an act of impulse growing out of some mental disease affecting his volition.

Doctors Montero and Kervin, who had defendant under observation for approximately 41 days, testified that they subjected him to the usual tests and examinations to determine his mental and physical condition, and found no organic damage to defendant's brain, no mental disturbance or mental illness. Defendant's I. Q. indicated that he functions in the normal range of intelligence. These doctors testified that defendant was neither mentally ill nor mentally defective, and was able to distinguish right from wrong. They found nothing to indicate that defendant acted on an irresistible impulse.

In addition to Dr. Lordi, defendant called Richard A. Childress, a bailiff of the lower court, who testified that on one occasion when

---

"A. Yes.

"After we killed the conscientious objector, we left and went over town. We was coming down West Broad Street. We saw a man walking down Broad Street. I told my brother. He made a U turn on Broad Street and came back down the same side the man was walking. I asked the man was he going to the bus station. He said he was. I told him to get in and we would take him. He got in the front between me and my brother. My brother turned off Broad and asked the man where was he going. He told my brother he was going to Williamsburg. My brother told him he would take him there. My brother told him he had another place to stop for a minute. We went over to a bootleggers house, but he was not at home. Then we left, went to the same place we had carried the conscientious objector, stopped. I opened the door and told him to get out. The time he got out, I shot him. He grabbed for his heart and mumbled. My brother came around and shot him. Together we both shot him approximately 10 or 11 times.

"When he fell, I jerked him down almost near to the other one. I went and got back in the car and my brother had already got in and started it up. We took the same road we was on, came up in the back of Fulton and William told me we had to ditch the car. We drove down to the dock. William said we were going to drive it off in the water but someone was down there. We waited 15 or 20 minutes then he said, we will have to burn it."

defendant was in court, he told the bailiff to "keep your hands off of me" and became so violent at the time that it took several officers to restrain him.

Defendant's witness, Doris A. Dawson, a social service case worker, testified that the mother of defendant was paranoid. She also stated that on one occasion when they attempted to put defendant in a foster home, he refused to go and had to be placed in his own home.

Elmer Seay, Jr., a welfare case worker, testified that the relations between defendant and his mother were not good and that he got the impression that the mother rejected the son.

Robert J. Halstead, a psychologist employed by the Juvenile Courts of Richmond, testified that in 1962 he made a psychological examination of defendant, at which time he felt that defendant was severely disturbed and was near psychosis. This witness entertained the idea that defendant might be psychotic and believed that this severe disturbance would continue unless he had intensive help. Halstead had not seen Penn since 1962.

This is a resumé of the testimony that concerned the sanity of defendant at the time he murdered Wilkins and Norment and his responsibility for these acts. The conflict in the evidence was resolved against the defendant. The verdict of the jury, which has the approval of the trial judge, is amply supported by the testimony of Doctors Montero and Kervin, and other facts and circumstances regarding defendant.

Defendant did not testify in his own behalf.

The critical and only question before us is whether defendant waived his right to the presence of an attorney, either retained or appointed, at the time he gave the statements which were admitted into evidence, and if such waiver and statements were made voluntarily, knowingly and intelligently. If they were not so made, we must reverse and remand these cases for new trials.

There is no dispute about the events that preceded the statements made by defendant on May 29th and 31st. In the consideration of this, and companion cases, we cannot completely divorce ourselves from the setting and locale in which these events occurred. In May, 1966, the Richmond Police Department was faced with six brutal murders, a felonious assault, and a rape—all unsolved. They had in their possession a warrant for the arrest of defendant Penn for rape and felonious assault, and, without question, had reason to suspect defendant of the commission of the murders.

On the morning of May 29, 1966, Thomas Lee Penn, Jr., in the company of his father and brother, surrendered himself at a city police station. Then occurred the following sequence of events: He was immediately advised of his constitutional rights by Detective Harry L. Duke, who testified:

"A. I advised him that he did not have to make any statement to us, any statement he made could be used in Court, he was entitled to have counsel and if he was without means to employ counsel of his own choosing that the State would appoint one for him.

"Q. Well, did you advise him at that time that the State would appoint one for him?

"A. Yes, sir."

Defendant, having said he thought that his father was going to employ counsel, was not questioned at that time but taken back to the detention section of the city jail.

At about 8:45 P.M. he was placed in a lineup, apparently routine, along with five other individuals of similar build and description. This lineup was not relative to the crimes here involved, and no questions were asked of defendant and no statements were made by him at the time.

At about 10 o'clock on that morning, Detective Duke talked with defendant who again said that he thought his father was going to employ counsel, and he did not care to make a statement at that time. None was made, and he was not questioned. Detective Duke did not see defendant again until about 8 P.M. on the 29th.

Detective Sergeant C. L. Brown was with Duke at 8:30 A.M. and corroborated Duke's testimony as to what then occurred. At about 1:30 P.M., Brown saw defendant in the detention cell and inquired if he wanted anything to eat, drink or smoke, and if an attorney had been to see him. When defendant responded that he had not, Brown asked if defendant wanted him to contact either Judges Huntley or Witt (of the Richmond Hustings Court) or Judge Maurice (of the Richmond Police Court) to have one of them appoint him an attorney. Defendant did not want this done.

According to the record before us, nothing else occurred involving defendant until about 8:30 P.M. when he was brought into the interrogation room.

Other police officers had been working on the cases and had dis-

covered a .22 calibre pistol, secreted in a washing machine in the home of defendant's brother, William. This pistol was brought into the room and exhibited to defendant. At this time defendant stated to Brown and Duke that he wanted "to tell . . . the truth" and " . . . he wanted to make a statement and tell everything that he had done". Prior to permitting him to make this statement, he was advised he did not have to make it. Officer Brown said:

> "[W]e told him that he still had the right to an attorney before making any statement and any statement that he made could be used for or against him in Court."

Penn then made the confession which was introduced in evidence. During the time that he was making the statement, Brown testified:

> "[W]e asked him several times whether or not he wanted anything or if he wanted to discontinue and he said no he wanted to get it over with."

Duke testified that:

> "[S]everal times during the taking of the statement we stopped and asked the defendant if he wanted anything to drink, anything to eat, wanted cigarettes, or if he was tired or did he want to continue on. On several occasions he requested coffee or cigarettes and sandwiches, which he was given, and he stated that he wanted to go ahead and complete his statement that night. He was not tired."

The statement was completed that night and signed by defendant in the presence of three witnesses. The full statement, filed as an exhibit, recites that it was voluntarily made of his own free will, without any threats or promises, and that defendant knew he was entitled to counsel and was willing to give the statement without the benefit of counsel. It shows that periodically defendant was given an opportunity to discontinue, and that his physical needs were met. Defendant stated that he made the confession because "I feel that I need help".

Memorial Day intervened between the surrender of this man on Sunday, May 29th, and Tuesday, May 31st. On May 31st, defendant was brought into police court, and, according to Detective Duke, "was asked at that time if he wanted to see anyone". Defendant

stated he wanted to call his father, but when it was mentioned that his mother was in court, he asked to see her.

Defendant talked to his mother for about 20 to 30 minutes, and after the conversation with her asked to see Duke and Brown. This request was relayed to them, and they went back to the cell to see Penn. At that time, both Brown and Duke testified that Penn said: "He wanted to tell us about the crimes that his brother William Penn was involved in—wanted to make an additional statement". Before he was permitted to make any additional statement, Brown testified:

"A. I can tell you—at that time I, we told him that—we advised him of his rights, that he didn't have to make a statement, and that any statement that he made could be used in Court and he still had the benefit of counsel, and he said 'I realize any statements that I may voluntarily make may be used in Court and that I'm entitled to counsel, but I'm willing to give you a statement at this time without the benefit of counsel,' and he's making it without any threats or promises.

"Q. Was he threatened at any time on the Tuesday morning you talked with him?

"A. No, sir.

"Q. Was he offered any promises?

"A. Not [by] me or anyone in my presence.

"Q. All right, and after that he gave an additional statement?

"A. That's right.

"Q. And the second statement, I believe you testified, he implicated his brother?

"A. That's correct."

Duke's version of what occurred prior to defendant making the additional statement is as follows:

"Q. All right, he asked to see you, and did you again advise him of his rights, what rights did you advise him?

"A. That he did not have to make any statement, any statement he made could be used in Court against him, that he was entitled to counsel, if he was without means to employ his own private counsel, that the State would appoint one for him.

"Q. All right, now, did he make a statement at that time?

"A. Yes, sir, he did.

"Q. Was his mother present when he made the second statement?

"A. No, sir.

"Q. Uh huh?

"A. He stated to me that after talking with his mother she had told him to tell the truth and that he wanted to give us an additional statement."

In his second statement defendant made no effort to excuse or exonorate himself of the crimes of which he is charged, but did implicate his brother William.

The confession of May 29th, and the circumstances surrounding it, have now been the subject of two trials that are currently under review by this court. This original statement, and the supplemental statement of May 31st, are involved in the instant case. The conclusion is inescapable that, notwithstanding the pressures that must have been on the Richmond City Police Department to solve the murders under investigation, they were meticulous in the treatment accorded defendant Penn. Repeatedly, and specifically before each statement, he was advised that he did not have to make one and that if he did it could be used for or against him. He was likewise advised that he was entitled to an attorney, employed or appointed, and did not have to make a statement out of the presence of an attorney. This man was not put in solitary confinement, and had free access to his family and to the telephone. He was not subjected to hours of questioning by relays of police officers. In fact, he was not questioned until he voluntarily decided to confess, and then only in connection with something he volunteered.

Two police officers, whose testimony is unimpeached, and whose integrity is not questioned, stated unequivocally that before confessing, defendant stated that he knew he was entitled to an attorney but that he wanted to make a statement.

The sanity of Penn has been determined by the jury. The record shows him to have completed nine grades of public schooling in Virginia and to be of average intelligence. It is needless for us to speculate as to why this man gave the statement. He says it was because "I feel that I need help", and he desired to tell the truth.

In any event, Penn decided that he did not need to consult with an attorney, or desire the presence of one, when the statements were given. Some significance can be attached to the fact that prior to

making the statement on May 29th, defendant had a lengthy telephone conversation with his father[3] and prior to making the statement of May 31st he had a lengthy conversation in person with his mother. It was after this conversation with his mother that he initiated the giving of the second statement by sending for the officers. He told them at that time that his mother had told him to tell the truth.

What we do know is that his confession did not come about by reason of promises, threats, torture, physical or mental discomfort, repeated questioning by the police or any hope of reward offered by them. The trial judge found that it was given voluntarily, knowingly and intelligently and that defendant's waiver of his right to the presence of an attorney, either retained or appointed, at the time he confessed, was likewise done voluntarily, knowingly and intelligently.

It is our conclusion here that the confessions meet the test prescribed in *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966), and that the trial court committed no error in admitting them for consideration by the jury.

We continue of the opinion expressed in *Penn* v. *Commonwealth*, *supra*, where we said:

"To hold the confession inadmissible under the facts and circumstances of this case would in effect say that once a defendant intimates that he or someone might employ an attorney to represent him, he will not thereafter be permitted to confess, or make any statement, unless and until such an attorney is employed or appointed—this irrespective of the fact that the defendant voluntarily, knowingly and intelligently waives his right to the presence of counsel. We do not believe that *Miranda* will be so extended, or that such was the intent of the Supreme Court." 210 Va. 213, 228, 169 S. E. 2d 409, 418-419 (1969).

The judgments of the lower court are

*Affirmed.*

---

[3] The record in *Penn* v. *Commonwealth*, *supra*, shows that Detective A. B. Epps, of the Richmond City Police Department, testified that in mid-morning of May 29th he asked defendant Penn if he desired to make a telephone call and Penn answered that he wanted to talk to his father who worked at Johnston-Willis Hospital. The father was gotten on the telephone by Detective Epps and Penn talked with him at length.