## Richmond

### RUPERT F. PEARSON, JR.

v.

### COMMONWEALTH OF VIRGINIA

March 6, 1981.

Record No. 800516.

Present: Carrico, C.J., Harrison, Cochran, Poff, Compton, Thompson, JJ., and Harman, S.J.

*Joseph L. Duvall; Peter D. Greenspun* (*George P. Blackburn, Jr.; Duvall, Blackburn, Greenspun & Hale,* on briefs), for appellant.

*Richard B. Smith, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

We granted this writ to consider whether the trial court erred in failing to suppress certain physical evidence seized by the police and the

extrajudicial statements made by the defendant after he had claimed his right to remain silent and his right to counsel. The appeal arises from a judgment confirming a jury verdict which convicted Rupert F. Pearson, Jr., of second degree murder of John Lundmark and abduction of Lynn Shifflett. In accordance with the verdict, the trial court imposed concurrent sentences of 20 years and six months.

Before reviewing the facts and circumstances pertinent to the motion to suppress, we will summarize the evidence bearing upon the merits of the two charges.

The evidence at trial showed that Pearson and Lynn Shifflett had been living together as man and wife in an apartment near Vienna. Shortly after midnight on the morning of May 29, 1979, the couple became involved in a heated argument. Shifflett admitted she had spent the night with a mutual acquaintance, John Lundmark, and Pearson attempted to force her to confess that they had had sexual intercourse. Shifflett testified that, over a period of "about three hours", Pearson assaulted her with a butcher knife and antique sword, "banged" her head against the wall, broke the sword over her knee, knocked her to the floor, and held the knife to her face threatening "to carve John's initials in [her] forehead." During the course of the assault, Shifflett "passed out" twice and Pearson shut her in a closet for a short interval. She asked him to "just let me leave" but "[h]e wouldn't let me." Then, "he held the knife to my throat and made me dial [Lundmark's] phone number". Lundmark agreed to "come and get me . . . and just hung up the phone." At that point, Pearson "stated that he was going to kill us and that he was going out to his truck to get his gun." While he was gone, Shifflett ran from the apartment and hid in the shrubbery in front of the building. She saw Pearson returning to the apartment "and he had the gun tucked in his pants." Ten minutes later, Lundmark drove into the parking lot and Shifflett attempted to intercept him before he entered the building. Unsuccessful, she tried to call the police from a pay telephone, but the telephone was out of order. "So, a few minutes later, that's when I heard the gunshot, and so I went to my car . . . and drove home."

Testifying at trial, Pearson said that Shifflett confessed that she "went to bed" with Lundmark. He admitted he had become enraged, hit her in the face, thrown her against the wall, and forced her to call Lundmark, but he denied that he had held a knife to her throat, choked her, or restrained her from leaving. He could "not recall telling her" that he was going to kill Lundmark. He explained that he forced her to call Lundmark "[s]o I could give him . . . [a] whipping or maybe just to scare her or scare him or something." He had gone to the truck

to get the gun, he said, to "protect" himself in the event Lundmark should bring his two roommates with him.

When Pearson discovered Shifflett had left the apartment, he searched the grounds for her. When he re-entered the building, he saw Lundmark leaning against the corridor wall opposite the apartment door. Describing what happened next, Pearson testified: "He made fists when he saw me coming down the steps." "We both started at each other." "I hit him in the mouth." "We just kept scuffling around and then the gun got pulled out that I had and went off. The next thing I knew, he was lying down on the floor and there is the gun beside him." "I picked up the gun and ran outside and threw it in a storm drain or whatever." Pearson then called a rescue squad and "told them a guy had been shot in the hallway". While waiting for the rescue squad, Pearson placed a towel on Lundmark's head and "beat on his chest a few times" because "he had stopped breathing."

Officer John Monroe arrived about 3:30 a.m. and found Lundmark lying on the floor. Monroe testified that Pearson told him that "he was shot in the head." Investigator Colin J. Kozloff, who arrived about 5:00 a.m., testified that Pearson told him that he didn't know anything about what had happened; that he "heard a noise or something outside the door and opened it and saw a subject lying on the floor of the hallway, called the police and that was it"; and that he "didn't really know" the victim except "by the name of John", a person he had seen "on occasions." On cross-examination, Pearson admitted he had lied because, he said, he wanted "[t]o get my motorcycle and my truck . . . to my father's. I was afraid it would get stolen." "I figured I would get my truck up there and come back and tell the truth." With the officer's permission, Pearson left and reported for work where he remained until arrested that afternoon. Kozloff then contacted and interviewed Lynn Shifflett. Based upon what she told him, he acquired a warrant for Pearson's arrest.

The remainder of Kozloff's trial testimony was addressed to the events following the arrest and the acquisition of the evidence Pearson sought to suppress. Over Pearson's objection, a taped transcription of his post-arrest statement to the police was played to the jury. With minor exceptions concerning the details of Pearson's assault upon Shifflett, his purpose in forcing her to call Lundmark, and his reasons for arming himself, the transcribed statement was substantially consistent with Pearson's testimony at trial.

The testimony at the pre-trial suppression hearing showed that Pearson was arrested at 2:30 p.m. and was promptly advised of his *Miranda* rights. In response to definitive questions, he stated that he did

not want to make a statement and that he wanted a lawyer to represent him. Pearson was arraigned before a magistrate at 2:45 p.m. and "processed". At 3:45 p.m. investigators Kozloff and Lawrence Oliff took him into a small room containing only one window in the door. Without repeating the *Miranda* warnings, they talked with him until 4:20 p.m. Oliff testified as follows:

"A. I asked him again the location of his truck. I told him that we thought that the weapon allegedly involved may be in the truck. That if he was found operating the truck, the truck would be seized and searched for the weapon.

"I asked him if the truck was at his father's and he said it was at his father's. I asked him where his father lived and he gave me directions of how to get to his father's.

"I asked him if the gun was in the truck. He didn't indicate one way or another. I told him that I didn't want to go all the way up there and search his vehicle if the gun was not there. Was the gun somewhere else.

"He indicated that we ought to go to Vienna. I said, 'for what?' He said, 'I just think we ought to go there.'

"I said, 'well, I don't want to go on a wild goose chase driving all over Fairfax County. Is the gun in Vienna.' He indicated— I don't remember his exact words, but he indicated it would be in our best interest to go to Vienna to recover the weapon. Subsequently, we went to Vienna."

Pearson testified that, at the time he was arrested, the officers had "asked me where my truck was and motorcycle and where the gun was" and "I told them I didn't have anything to say about it." When they "put me in this little room", he continued, "Oliff said that he is going to impound my truck and hassle my father, impound my motorcycle unless I told him where this weapon was" and that the reason he agreed to take the officers to Vienna to get the gun was "[b]ecause I thought they were going to do something to my father or to me."

Guided by Pearson, the officers retrieved the gun about 5:00 p.m. from a storm sewer in the parking lot. Recognizing a friend in a passing car, Pearson asked the officers to stop it. Pearson's friend gave him a note containing the name of a lawyer. The officers then took him to his apartment where they drafted a handwritten form granting consent to search and stating, "I do not request a attorney at this time." Pearson signed the form, and the officers seized the butcher knife and sword introduced in evidence at trial.

From there, the officers took Pearson to their office where the three men ate sandwiches they had bought on the way. At 6:59 p.m., Pearson signed a standard *Miranda* waiver form which contained this additional language: "I know what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me by anyone." Responding to the officer's questions, Pearson gave the tape-recorded statement played at trial. A stenographer arrived at 7:40 p.m. and began transcribing the statement. After Pearson had read and initialed the first page, he stopped and refused to go on. He explained that he realized that the statement was incriminating and ' decided that "I could take my chances on them beating me up or something instead of signing something to put me in jail."

Shortly after he was taken to jail at 9:25 p.m., Pearson called an attorney. He said that he had not asked permission to make a call earlier because he did not know he had the right to do so. Pearson was released on bond, rearrested on the abduction charge, and again released on bond pending trial.

Holding that Pearson had not been subjected to coercion and that his conduct and statements were voluntary, the trial court denied the pre-trial motion to suppress and, during the trial, overruled Pearson's objections to the introduction of the gun, the knife, the sword, and the tape-recording.

■ The defendant asks us to reverse his convictions on the ground the challenged evidence was the product of violations of his Fifth and Sixth Amendment rights.[1] As soon as he was arrested and given the *Miranda* warnings, he invoked his right to remain silent and his right to counsel.

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interro-

---

[1] Alternatively, Pearson argued on brief that this evidence should have been suppressed as the product of a violation of Code § 19.2-80 which provides in part:

"[A]n officer making an arrest under a warrant shall bring the arrested person without unnecessary delay before and return such warrant to a court . . . or before an official having authority to grant bail, who shall admit him to bail or commit him to jail . . . ."

The purpose of this statute is to safeguard a defendant's constitutional rights by proscribing unnecessary delay between arrest and arraignment. *See Winston* v. *Commonwealth,* 188 Va. 386, 394, 49 S.E.2d 611, 615 (1948); *Sands & Co.* v. *Norvell,* 126 Va. 384, 101 S.E. 569 (1919). Pearson was taken before a magistrate only 15 minutes after his arrest. The constitutional errors of which he complains did not occur during this interval, and we find no merit in this argument.

gation must cease. . . . [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."

*Miranda* v. *Arizona,* 384 U.S. 436, 473-74 (1966).

■ As applied in *Miranda,* the Sixth Amendment right to "Assistance of Counsel" is an essential accessory to the right against self-incrimination. "[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege. . . ." *Id.* at 469. The right to counsel attaches when "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into custody, [and] the police carry out a process of interrogation that lends itself to eliciting incriminating statements". *Escobedo* v. *Illinois,* 378 U.S. 478, 490-91 (1964); *accord, Cooper* v. *Commonwealth,* 205 Va. 883, 891-92, 140 S.E.2d 688, 694 (1965).

■ "The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial." *Escobedo,* 378 U.S. at 490, n. 14. "There is no question but that a defendant who has asserted his *Miranda* rights may change his mind and waive them." *United States* v. *Smith,* 608 F.2d 1011, 1013 (4th Cir. 1979). *See Johnson* v. *Commonwealth,* 220 Va. 146, 157-58, 255 S.E.2d 525, 531 (1979). *LaBonte* v. *Commonwealth,* 217 Va. 677, 678, 232 S.E.2d 738, 739 (1977); *Lamb* v. *Commonwealth,* 217 Va. 307, 311, 227 S.E.2d 737, 740-41 (1976); *Taylor* v. *Commonwealth,* 212 Va. 725, 727-28, 187 S.E.2d 180, 182-83 (1972); *Skinner* v. *Commonwealth,* 212 Va. 260, 263, 183 S.E.2d 725, 728 (1971); *Land* v. *Commonwealth,* 211 Va. 223, 228-29, 176 S.E.2d 586, 590 (1970); *Penn* v. *Commonwealth,* 210 Va. 229, 241, 169 S.E.2d 419, 427 (1969).

■ However, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to. . .counsel." *Miranda,* 384 U.S. at 475. And "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan* v. *Mosley,* 423 U.S. 96, 104 (1975).

■ Less than two hours after Pearson had expressly claimed his rights, the officers took him into a small room. Since he had already been arraigned and "processed", they could have had but one purpose. "[T]he *Miranda* safeguards come into play whenever a person in

custody is subjected to either express questioning or its functional equivalent." *Rhode Island* v. *Innis,* 446 U.S. 291, 300-01 (1980). *See also Brewer* v. *Williams,* 430 U.S. 387 (1977). As the record shows, Pearson was subjected, without benefit of new *Miranda* warnings, to express questioning. While the Attorney General insists that the questions put to him were "innocuous" and intended only "to save the defendant's family and others some trouble", the questions concerning the location of the truck and gun were clearly intended to elicit information incriminating Pearson. The investigation, focusing upon him alone, had reached the accusatory stage. The officers knew that seizure of the gun, identification of its ownership, and tests establishing it as the murder weapon could be used as evidence to reinforce Shifflett's testimony against the defendant. While such evidence may have been merely corroborative, it was distinctly incriminating. "The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination." *Miranda,* 384 U.S. at 476.

The Attorney General next maintains that Pearson never specifically responded to the officers' questions "but, instead, *volunteered* that he wanted to take them to Vienna." "[I]t was at this point," the Attorney General says, "that the defendant implicitly waived his previously asserted rights." We accept neither the premise nor the conclusion. Although Pearson's verbal replies were not literally responsive, they were effectually so; he told the officers where the gun could be found, and he helped them find it.

The defendant testified that he did so only out of concern for the security of his property and his own safety and that of his father. We disregard that testimony as immaterial to our analysis. We are of opinion that the officers did not scrupulously honor Pearson's right to cut off questioning and his right to counsel. For that reason, his incriminating response was not constitutionally voluntary. Hence, it was not a constitutionally-sufficient waiver of his previously asserted rights. Manifestly, the evidence seized and the statement taken were the tainted products of the constitutional violations. We hold, therefore, that the court below erred in overruling the defendant's motion to suppress and his objections to admission of the evidence at trial.

We consider now whether, as the Attorney General contends, the evidence apart from the inadmissible evidence is sufficient to enable us "to declare a belief that [the error] was harmless beyond a reasonable doubt." *Chapman* v. *California,* 386 U.S. 18, 24 (1967).

The Supreme Court has held that, when a conviction rests in part upon an involuntary confession, the harmless error rule "is an im-

permissible doctrine." *Lynumn* v. *Illinois,* 372 U.S. 528, 537 (1963). *See also Haynes* v. *Washington,* 373 U.S. 503, 518 (1963); *Payne* v. *Arkansas,* 356 U.S. 560, 568 (1958). But in *Milton* v. *Wainwright,* 407 U.S. 371 (1972), a majority of the Justices applied the doctrine and affirmed a conviction challenged on Fifth and Sixth Amendment grounds. Although a minority believed the evidence did not satisfy the *Chapman* standard, the dissent did not dispute the majority's view that the doctrine is applicable on review of appeals involving Fifth and Sixth Amendment violations. And, relying upon *Milton,* the Sixth Circuit Court of Appeals has applied the doctrine in a case, much like the one at bar, where the police induced the accused to confess by continuing to question him after he had invoked his right to counsel and his right to remain silent. *United States* v. *Charlton,* 565 F.2d 86, 92 (6th Cir. 1977), *cert. denied,* 434 U.S. 1070 (1978). *See also Harryman* v. *Estelle,* 616 F.2d 870, 875 (5th Cir. 1980); *Carvey* v. *LeFevre,* 611 F.2d 19, 23 (2nd Cir. 1979); *Wilson* v. *Henderson,* 584 F.2d 1185, 1189 (2nd Cir. 1978), *cert. denied,* 442 U.S. 945 (1979).

 Applying the doctrine here, we examine the evidence lawfully admitted at trial.[2] Pearson argues that once the incompetent evidence was introduced, "the defendant was forced to testify at trial." When an accused takes the stand "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison* v. *United States,* 392 U.S. 219, 223 (1968). While Pearson's trial testimony did not "overcome the impact" of his tape-recorded statement but, rather, confirmed it in all material respects, we will not notice any of his inculpatory testimony in considering whether the error committed below was harmless.

 We find Shifflett's testimony altogether sufficient to prove all the elements of the crime of abduction as those elements are specifically stated in Code § 18.2-47,[3] and we address our harmless error inquiry to Pearson's conviction of murder.

 "The burden is upon the Commonwealth to prove beyond a

---

[2] We do not intend to hold that the doctrine of harmless error is applicable in all cases. "[T]here are differences between those confessions which are inherently coercive and which have been traditionally stricken as lacking in voluntariness and those which, though otherwise voluntary, have failed to comply with the strict procedural requirements of *Miranda.*" *United States* v. *Charlton, supra,* 565 F.2d at 92.

[3] The question whether asportation is an *implied* element of the statutory offense is not before us on this appeal. *See Johnson* v. *Commonwealth,* 221 Va. 872, 275 S.E.2d 592 (1981), this day decided.

reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the crime." *Boykins* v. *Commonwealth,* 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969). All of the competent testimony at trial shows that Pearson was present at the *place* of the crime immediately before and after the *time* it was committed. Shifflett saw him enter the apartment building after Lundmark arrived and, a few minutes later, heard a gunshot. Lundmark died of a gunshot wound, and Shifflett had seen a gun in Pearson's pocket as he entered the building. Thus, it is plain the defendant had the *means* as well as the opportunity to commit the crime.

And Shifflett's narrative of events preceding the killing establishes the *motive* to kill. Jealous and enraged by what he perceived to be Shifflett's infidelity, Pearson terrorized her in a brutal, protracted assault, forced her to call Lundmark to come to her aid, threatened to kill him, armed himself with a loaded gun, and remained at the apartment until Lundmark had arrived. Such evidence entirely justifies the jury's finding of *mens rea.*

"In all cases of circumstantial evidence *the conduct of* the accused is always an important factor in the estimate of the weight of circumstances which point to his guilt." *Dean* v. *Commonwealth,* 73 Va. (32 Gratt.) 912, 923 (1879). Pearson's words and deeds following the crime are factors equally as important as his earlier conduct. As appears from the testimony of the officers and that of Shifflett considered together, the story he told the authorities was a deliberate falsehood designed to conceal what had happened and focus suspicion upon some fugitive gunman. Significantly, he persisted in that falsehood until he learned the police had been told something about the gun he carried in his truck. The jury could have concluded that such conduct was not that of a man innocently involved in an accidental shooting.

Ignoring all the evidence which should have been suppressed, we are of opinion the Commonwealth discharged its evidentiary burden of "pointing out the accused as the perpetrator of the crime." *Boykins* v. *Commonwealth, supra.* Indeed, there is nothing of record to support a reasonable hypothesis to the contrary. Accordingly, we "declare a belief that [the error committed below] was harmless beyond a reasonable doubt", and the judgments will be affirmed.

*Affirmed.*