# James Martin Brown

### v.

# Commonwealth of Virginia

Record No. 880727

June 9, 1989

Present: Carrico, C.J., Compton, Stephenson, Thomas, Whiting, and Lacy, JJ.,
and Poff, Senior Justice

*Ned M. Mikula; Cary B. Bowen (Rudy, Keown, Evans & Mikula*, on brief), for appellant.

*Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

Senior Justice Poff delivered the opinion of the Court.

This is an appeal from an order of the Court of Appeals refusing a petition for appeal from a judgment of the Circuit Court of Henrico County confirming a conviction of murder in the first degree. In three assignments of error, appellant James Martin Brown challenges the sufficiency of the evidence and the trial court's rulings refusing two instructions proffered by the defense.

Responding to a telephone call placed by the defendant to emergency number 911, the police arrived at Brown's townhouse about 10:25 p.m. on February 16, 1984. Brown, waiting outside, motioned to the officers to park in front of the townhouse. As the police entered the door, they saw Mrs. Brown lying face down in a pool of blood in the foyer. On the floor of a hall leading from the foyer, they found her attache case, her unopened purse, the keys to her car, a hunting knife, and a cast iron skillet. A butcher knife was lying nearby on the kitchen floor.

A rescue squad arrived a short time later and transported both Brown and his wife to a hospital. Mrs. Brown was dead upon arrival. An autopsy disclosed two blunt-force injuries to her skull, apparently made by blows with the skillet; two stab wounds in the victim's chest and five in her back, three of which were lethal;

nine lacerations of her right hand and two of the left; and blood under her fingernails, one of which was freshly broken. Mrs. Brown's stomach contained "minimally digested food that appeared to be carrots, onions, and stringy meat."

Mrs. Brown's blood was type O, the defendant's type A. The analysis of blood removed from the hunting knife showed a mixture of type A blood and blood of some other type which could not be identified. The amount of blood removed from Mrs. Brown's fingernails and from the butcher knife and skillet was not sufficient to be typed. Bloody footprints found on the floor of the townhouse and on the back patio leading to the storage shed matched the soles of shoes worn that night by the defendant and by the paramedics.

Brown showed the officers a stab wound in his right thigh. According to the paramedic who treated him, Brown had lost "between 500 and 800 cc's of blood" and appeared to be "going into [shock] while enroute to the hospital." The chief medical examiner opined that "either of the [knife] blades could inflict a wound like this." Asked if the injury was "inconsistent or consistent with a self-inflicted wound", he said, "Yes, that would be within arm's reach, the medial aspect of the right leg." An officer who interviewed Brown in the hospital emergency room testified that "[t]he only wound he had was in his leg." However, in an interview the next day, Brown said that he "got a small cut on [his] finger".

The investigating officers found a rear window unlocked and the screen removed and bent. The sliding glass doors leading to the patio were open. Stacked in and around a large chair near that door were two television sets, a radio, a camera, luggage, and several other items usually kept elsewhere in the house. A bag in the dining room contained certain personal articles that had been kept in Mrs. Brown's chest of drawers and elsewhere in the bedroom.

Brown's account of events was detailed in the investigating officers' testimony concerning interviews with the defendant and in tape recordings of some of those interviews introduced as exhibits by the Commonwealth. According to Brown, he had spent the afternoon designing and sewing a blue denim face mask to be used as a pattern by participants in a St. Patrick's Day parade. Brown said that he and his wife had shared fish for supper before she left to attend a night class and he went for a "workout" to a local gymnasium. When he started home about 10:00 p.m., he had trouble starting his car. To protect his dress clothes while he was

working on the motor, he put on coveralls he kept in the trunk of the car. After some time, he got the car started and drove home. He explained he had parked beside his wife's car near the swimming pool 180 feet from his townhouse because he found no vacant space closer to his door.

When he entered the front door, he saw his wife lying on the floor in the foyer. In the room to his left he heard a noise, and although no lights were burning in the house, he saw a masked man rushing at him with a knife. During the ensuing struggle, Brown ripped the mask off the man's face. Light from a street light near a window afforded a glimpse of his assailant, and Brown thought he favored his eldest son, one of his children by a former marriage. The son had a criminal record, and during his stay at the townhouse several months earlier, he and Mrs. Brown "were not friendly toward each other".

As Brown and his assailant rolled about on the dining room floor, the man stabbed him in his leg, arose and ran through the sliding glass doorway to the patio. Tracking blood as he went, Brown crossed the patio and searched the storage shed. Finding nothing, he returned to the foyer and knelt at his wife's side. He was unable to get any response from her and presumed her to be dead. Brown then went to the dining room and called the emergency telephone number. Returning to his wife, Brown stopped to take off his bloody coveralls. Upon arriving in the foyer Brown recognized the hunting knife as one his son owned. In what he described as a state of panic caused by this incriminating evidence, Brown picked up a pair of bloody work gloves he had found beneath a picnic table on the patio, the blue denim face mask which he recognized as the one he had made that afternoon, and his coveralls, placed the three items in a grocery bag, and threw the bag over a fence into a construction area.

Brown went outside to wait for the police and the rescue squad. When the officers arrived, he gave them a description of his assailant. He did not tell them, however, that he suspected his son or that he had disposed of the contents of the grocery bag. In a telephone call several days later, he told the police what he had done and where the bag could be located. He explained that he no longer needed to shield his son because he had confirmed the fact that his son had been at work the night of the murder.

Following Brown's directions, the police recovered the grocery bag and submitted the contents for analysis to a forensic scientist.

The analysis showed type O blood stains on the blue denim mask. The only hairs lifted from the mask were consistent with Brown's hair and that of his wife. Blood and blue denim fibers were found on the skillet. Blood on the right sleeve of the coveralls proved to be type O, and blood elsewhere on the garment was type A. Between the third and fourth fingers of one of the work gloves was a cut and blood of both types, visible inside as well as outside.

The trial court overruled the defendant's motion to strike the evidence and submitted the case to the jury. The jury returned a verdict of guilty of murder in the first degree, and the court entered judgment confirming the verdict and imposing a sentence of life in the penitentiary. In its order refusing Brown's petition for appeal, the Court of Appeals held that the evidence was sufficient to support the jury's verdict and that the jury had been properly instructed. We granted the defendant this appeal.[1]

## I.

Addressing the defendant's first assignment of error, we must determine whether the evidence was sufficient to support the jury's finding that Brown was the criminal agent. The defendant argues that the evidence "did not exclude every reasonable hypothesis consistent with the innocence of the defendant." He insists that the evidence supports the conclusion that the murderer was a burglar caught in the act by Mrs. Brown, and that this is a reasonable hypothesis. In our opinion, his story, viewed in the light most favorable to the Commonwealth, was self-incriminating.

According to that story, Brown and his wife had shared a supper of fish. The autopsy report of the contents of Mrs. Brown's stomach contradicts Brown's statement.

Brown said that he parked his car 180 feet from his townhouse because he could find no vacant space closer to the door. Yet, only 25 minutes after Brown said he had left the gymnasium, the police arrived and parked their car directly in front of the townhouse. A factfinder could believe that Brown parked where he did so his wife would not know he was home when she arrived.

---

[1] This appeal arises from the judgment entered in a second trial of the indictment. Holding that the trial court had erred in admitting certain evidence in the first trial, the Court of Appeals had reversed the judgment confirming that conviction and remanded the case for a new trial. *Brown* v. *Commonwealth*, 3 Va. App. 182, 348 S.E.2d 849 (1986).

Brown had told the police his wife's car was parked at the swimming pool when he parked there. Testifying at trial, the investigating officer said that he had found her car "parked in front of their home."

In Brown's first description of the man who allegedly attacked him, he said that he had "collar length, long hair . . . down over his ears" but no facial hair; in a later interview, Brown said that his hair was "bushy" and that he had a "small short beard".

Brown also said that the man he saw rushing at him with a knife was wearing the mask ripped off during the struggle. If so, it would seem that a strand from a head of long or bushy hair would have been found on that mask. Instead, the only hair lifted from the mask at the crime laboratory was Brown's hair and that of his wife.

The mask was one Brown had made earlier that day using blue denim material. Blue denim fibers were found clinging to the skillet. Neither Brown nor his wife was wearing clothing made of such material. It is not unreasonable to believe that the fibers on the skillet came from the mask Brown was wearing.

According to Brown's story, the murderer was wearing work gloves. The gloves recovered by the police contained blood, some of which was consistent with Brown's blood type, and one had a cut between two fingers. Brown had told one of the investigating officers that he had a "small cut on [his] finger".

Brown reported that he had retrieved the gloves from a spot on the patio under a picnic table. Although Brown left bloody footprints as he crossed the patio toward the storage shed, none of those footprints approached the picnic table.

Brown believed that the blood in his footprints came from the stab wound in his leg that he maintained had been made by his assailant. The wound could have been made by Mrs. Brown. As the forensic scientist testified, it could have been self-inflicted.

Significantly, all the bloody footprints found inside and outside the house were made either by Brown or the attending paramedics. None were consistent with unidentified shoes such as those worn by an intruder. Nevertheless, Brown stated that a stranger had stabbed his wife seven times, left her lying in a pool of blood, stabbed him in his leg, and fled from the house across the rear patio.

As proof of his story that the murderer was a burglar, Brown points to the items stacked by the sliding glass doors. A jury,

shown photographs depicting the quantity, size, and weight of those items could refuse to believe that a lone burglar would attempt to assemble and take and carry away such a cumbersome burden.

Finally, Brown's story that he suspected his son of the crime and, in an effort to protect him, concealed evidence that incriminated him leaves unanswered the question why Brown left his son's bloodstained hunting knife lying beside the victim's body while he was careful to hide his own mask and coveralls, both stained with the victim's blood.

■ We are asked to hold as a matter of law that the evidence was insufficient to support the factfinder's conclusion that Brown was the person who murdered Mrs. Brown. We cannot.

## II.

In his second assignment of error, the defendant questions the trial court's ruling refusing Instruction A. The Commonwealth had introduced evidence of the interview Officer J. M. Dorton conducted with Brown the day after the murder. The following is an excerpt of a transcript of that interview concerning Brown's relationship with his wife:

Dorton:  You haven't had any recent arguments?

Brown:  No, she was the type person that, wouldn't argue, she'd just walk out of the house, if there was a tense situation, so that defused a lot of things that might have happened. We haven't had any problems, we were, we were doing very well.

The Commonwealth's Attorney referred to this evidence in his argument against the defendant's motion to strike. Defense counsel apparently understood that argument to imply that while Mrs. Brown's policy of withdrawal had defused verbal conflicts in the past, the situation that developed the night of the crime was one too tense to be defused and escalated into a physical conflict that became the motive to kill.[2] At another point in his argument, the Commonwealth's Attorney had remarked that "motive . . . goes to intent". Construing the language used by the Commonwealth's

---

[2] The Commonwealth's Attorney pursued a similar thesis in argument to the jury and in his brief in opposition to the defendant's petition for appeal in the Court of Appeals.

Attorney invoking the excerpt from the Dorton interview as proof of *motive*, defense counsel proffered Instruction A which read as follows:

> Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means and conduct must all concur to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt.

This instruction was taken verbatim from our opinion in *Bishop v. Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984), citing to *Stover* v. *Commonwealth*, 222 Va. 618, 623, 283 S.E.2d 194, 196 (1981), and to *Inge* v. *Commonwealth*, 217 Va. 360, 367, 228 S.E.2d 563, 567-68 (1976). That language traces its roots to *Dean's Case*, 73 Va. (32 Gratt.) 912 (1879). As the defendant interprets *Bishop* and all the progeny of *Dean's Case*, an accused in a circumstantial evidence case is entitled to the benefit of the instruction proffered here whenever the prosecution introduces and relies upon any evidence to prove motive as an inculpatory circumstance. We disagree.

The question is controlled by our recent decision in *Cantrell* v. *Commonwealth*, 229 Va. 387, 329 S.E.2d 22 (1985). There, we reconciled an alleged conflict between the circumstantial evidence rule and the rule that "[m]otive has never been a requisite element of the crime of murder in Virginia." *Id.* at 397, 329 S.E.2d at 29 (citations omitted). We did so by underscoring the fact that the circumstances contemplated by the circumstantial evidence rule as defined in *Bishop*, *Stover*, and *Inge* are "those circumstances which *are* proved" and proved in such manner that "each be consistent with guilt and inconsistent with innocence, and . . . consistent with each other . . . in pointing to the defendant as the perpetrator beyond a reasonable doubt." *Id.* at 398, 329 S.E.2d at 29 (emphasis in original).

The defendant's interpretation of the argument made by the Commonwealth's Attorney ignores the distinction between motive to kill and intent to kill that we noted in *Cantrell*, *id.* at 397, 329 S.E.2d at 29. Although, the comment made by the Common-

wealth's Attorney that "motive . . . goes to intent" indicates that he considered motive and intent interchangeable concepts, it is clear that motive can exist without intent and intent without motive. "Motive and intent are not synonymous. Motive is the inducing cause, while intent is the mental state with which the criminal act is committed." C. Torcia, Wharton's Criminal Evidence § 170 (13th ed. 1972). Said differently, intent is the will to use a particular means or method to achieve a certain result; motive is the reason that induces the mind to desire that result. The dialogue in issue is evidence of intent, not evidence of motive.

▇▇▇ In keeping with our decisions that motive (as distinguished from intent) is not an essential element of murder in a direct evidence case, we have never said, and we now expressly disavow, that motive is an essential element of murder in a circumstantial evidence case. What we have said, and now reaffirm, is that once motive is *proved*, the underlying evidence of motive must concur with the circumstantial evidence of other inculpatory circumstances — time, place, means, and conduct — in identifying the accused as the criminal agent beyond a reasonable doubt. In such case, the accused is entitled to the instruction at issue. We find no such evidence of record in this case, and we reject the defendant's challenge to the trial court's ruling refusing Instruction A.

### III.

▇▇▇ The defendant's third assignment of error attacks the trial court's ruling refusing Instruction B. That instruction, which told the jury that "evidence of subsequent suspicious conduct does not constitute evidence sufficient to support a finding of guilt beyond a reasonable doubt", tracks our pronouncement in *Bishop*, 227 Va. at 169-70, 313 S.E.2d at 393.

We have held, however, that such pronouncements, although pertinent to the analysis in a particular case, are not necessarily appropriate as jury instructions in every case. *Oak Knolls Realty* v. *Thomas*, 212 Va. 396, 397, 184 S.E.2d 809, 810 (1971). Moreover, when, as here, the evidence relevant to the determination of a factual issue essential to the disposition of the dispute is in conflict, trial courts should not grant instructions that appear to place a judicial imprimatur on selective evidence.

*Nelms* v. *Nelms*, 236 Va. 281, 286, 374 S.E.2d 4, 7 (1988). That rule applies with equal logic to Instruction B which appears to deprecate selective evidence.[3]

## IV.

We agree with the decision of the Court of Appeals respecting all assignments of error, and we will affirm its order and the judgment of the trial court confirming the jury's verdict.

*Affirmed.*

Justice Stephenson dissenting.

For more than a century, the law as expressed in Instruction A was relied upon without question. *Cantrell*, decided in 1985, was the Court's first departure from this established law. *Cantrell* essentially repudiated law relied upon by this Court as recently as 1984. *See Bishop* v. *Commonwealth*, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984).

The instruction was given in those rare cases when the evidence was *wholly* circumstantial. Thus, countless juries have been instructed in accordance with Instruction A, *i.e.*, that when the evidence is wholly circumstantial, "[t]he chain of *necessary circumstances* must be unbroken . . . [and] must *all* concur to form an unbroken chain which links the defendant to the crime" (emphasis added).

What were those "necessary circumstances"? They were "motive, time, place, means and conduct." *Bishop*, 227 Va. at 169, 313 S.E.2d at 393.

The majority seems to confuse *elements* of a crime with those *circumstances* necessary to prove criminal agency when the evidence is wholly circumstantial. Obviously, none of the necessary circumstances, *i.e.*, motive, time, place, means, and conduct, is an element of a crime. Each, however, must be proved in a wholly circumstantial evidence case to establish that the accused was the perpetrator of the crime.

---

[3] While evidence of subsequent conduct, standing alone, is insufficient to identify the accused as the criminal agent, evidence of conduct "is always an important factor in the estimate of the weight of circumstances which point to his guilt", *Dean's Case*, 73 Va. (32 Gratt.) at 923, and "words and deeds following the crime are factors equally as important as his earlier conduct", *Pearson* v. *Commonwealth*, 221 Va. 936, 946, 275 S.E.2d 893, 900 (1981).

The majority speaks of reconciling an alleged conflict between our long-established circumstantial evidence rule and the equally long-established principle that motive is not an element of the crime of murder. No conflict, however, has ever existed between these two ancient principles. Rather, in a wholly circumstantial evidence case, proof of all five necessary circumstances, including motive, was required to establish criminal agency. In cases where there is some direct evidence, however, neither motive nor any other necessary circumstance need be proved.

The majority, reaffirming *Cantrell*, says motive no longer is a necessary circumstance. What necessary circumstance will the majority eliminate tomorrow? Will it be time, place, means, or conduct? Indeed, will it be that, eventually, the majority will eliminate the need to prove any of these circumstances?

I ask these rhetorical questions because the majority reasons that only if motive is *proved* "must [it] concur with the circumstantial evidence of other inculpatory circumstances — time, place, means, and conduct — in identifying the accused as the criminal agent." I construe this to mean that only those circumstances that are proved need to concur. Thus, if none is proved, a concurrence of circumstances is not required.

Although the majority implies that proof of all the listed circumstances is not necessary, we said a mere five years ago:

> We are guided by familiar principles. Where the evidence is entirely circumstantial, all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and must exclude every reasonable hypothesis of innocence. The chain of necessary circumstances must be unbroken. The circumstances of motive, time, place, means, and conduct *must all concur* to form an unbroken chain which links the defendant to the crime beyond a reasonable doubt.

*Bishop*, 227 Va. at 169, 313 S.E.2d at 393 (emphasis added).

For the reasons stated herein and in my dissent in *Cantrell*, I again dissent today.