COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Haley
Argued at Chesapeake, Virginia


EDMOND ANTONIO WHITE

MEMORANDUM OPINION[*] BY
v.        Record No. 2203-05-1                    JUDGE JAMES W. HALEY
NOVEMBER 28, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SOUTHAMPTON COUNTY
Westbrook J. Parker, Judge

Joseph R. Winston, Assistant Appellate Defender (Catherine E.P.
Haas, Assistant Appellate Defender; Virginia Indigent Defense
Commission, on brief), for appellant.

Josephine F. Whalen, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


Convicted in a bench trial of grand larceny, appellant maintains 1) the evidence was

insufficient to support that conviction and 2) that the court erred in permitting the

Commonwealth to inquire as to his alleged drug use as inadmissible "other crimes."  We affirm.

I.

FACTS

Edmond White ("appellant") was the boyfriend of the victim in this case, Shirley Scott

("Scott").  The time frame that follows is highly relevant.

At approximately 8:30 p.m. on March 1, 2005, Scott placed $1,000 into her Bible, which

was located in her bedroom.  At that time, Scott also gave $5 to the appellant, who then left the

house.  There were four other people in the house at that time, Scott's son, Rico Scott, her

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

daughter, Juleesa Scott, her niece, LaCresha Scott, and her other niece, two-year-old Quanshell Scott.

Shortly after 8:30 p.m., Scott received a phone call and left the house to visit the family of a deceased friend. The four children were the only people in the house during this time. While Scott was gone, she received a phone call from the appellant asking her where she was. After telling him that she was at a friend's house, appellant asked Scott if she was driving or walking. Scott replied that she was driving and would be home in a little while. Appellant responded by telling Scott that she did not have to go home.

Scott returned to her house around 10:00 p.m. along with another friend, Kevin Runner ("Runner"). Appellant returned to the house at approximately the same time. Runner remained at the house for five to ten minutes before Scott and the appellant took him home. Scott was with Runner the entire time he was in the house, and Runner never entered the bedroom. Rico and Juleesa Scott were both in bed when Scott and the appellant left to take Runner home. LaCresha Scott was in the living room during this time.

After returning to the house around 11:15 p.m., Scott told appellant she was going to make something to eat. Appellant then went into Scott's bedroom, came back out, and asked her if she was all right. Scott responded that she was not all right because her friend had just died. Appellant then said he was going to leave for about two hours, he went outside, came back in, and went back into the bedroom a second time. When he came out the second time he asked Scott if she was all right again and then asked her if she was going to cook. Scott responded that she had already cooked. Appellant then went into Scott's bedroom a third time, came back out, said he was leaving, and never returned. Both Scott and her niece LaCresha testified that this behavior was "unusual." Appellant left the house for good at around 11:30 p.m. Scott went to bed around 12:00 a.m.

- 2 -

Around 9:00 a.m. on March 2, 2005, Scott left the house in order to make a mortgage payment at the bank. After remembering that her money was not in her purse, she went back in the house to retrieve it from the Bible and discovered that the money was no longer there. Thus, the money was taken between 8:30 p.m. on March 1 and 9:00 a.m. on March 2.

Scott immediately tried to contact the appellant at several locations by phone, but could not locate him. Scott testified that she "started calling everybody trying to find [appellant] because he was gone and [her] money was gone." After the appellant called Scott back and denied having taken the money, Scott told the appellant that she was going to call the police. Scott testified that appellant told her to "bring the police on." Two days later, on March 4, appellant finally turned himself in to police and was incarcerated from that point on.

All three children competent to testify denied taking the money. Scott testified that the appellant was the only other person in the room when she put the $1,000 in the Bible. She also stated that she did not habitually keep money in her Bible. When Scott was asked on cross-examination about putting the money in her Bible, she described the events this way:

> Q      When Mr. White was in your house in the bedroom - -
> A      Uh-huh.
> Q      - - what was he doing while you were putting money in the bible?
> A      Standing in the door looking at me.
> Q      He was just sitting there looking at you?
> A      Just standing. He [wasn't] sitting, he was standing there looking at me.
> Q      And how long had he been standing there?
> A      For a good minute or two. Because he always talking about he wanted to go score some dope and all this mess. And I [wasn't] going to hand him no money to score no dope.
> Q      Okay, what did you give him money for?
> A      To go get a pack of cigarettes, go get him some cigarettes. With five dollars, what's he going to do with five dollars?
> Q      Okay.
> A      Just to keep him from not having nothing in his pocket I gave him five dollars. He's my boyfriend. I didn't want to see him without no money. So I gave him five dollars.

Scott was also asked during her cross-examination whether her friend Runner had a drug problem and responded, "No, not to my knowledge. [Appellant] had a noticeable drug problem."

Appellant denied taking Scott's money or knowing that it was in the Bible. Appellant testified that, "The only money I seen that she had was five dollars she gave me." On cross-examination, the appellant stated the following:

> Q [B]ut you don't work?
> A No, I don't work.
> Q And you didn't have any money?
> A I was doing community service.
> Q All right, you were doing community service, but you don't have a job and didn't have a job then that you got any money at all; isn't that right?
> A Yeah.
> Q Isn't that right?
> A That's right.
> Q The only money that you say you had this night was that five dollars she gave you; is that right?
> A Yes, sir.
> Q You don't have any money from any other source?
> A No, sir.
> Q The total amount that you had in all your pockets was five bucks that you had gotten from your girlfriend; is that right?
> A Exactly.

In contradiction to appellant's testimony, Tamatha Jefferson ("Jefferson") testified that she saw appellant sometime in March at 1:00 a.m. with twenty dollars in his hand. Jefferson testified that appellant said he was going to pay someone to drive him to the store to buy cigarettes. Appellant was arrested on March 4, 2005 and incarcerated thereafter until trial. Thus, though Jefferson could not specify the specific date when she saw and spoke with appellant, it must have occurred in March, before March 4.

During cross-examination of the appellant, his counsel objected to the Commonwealth's line of questioning regarding his alleged drug habit as inadmissible evidence of other crimes. That exchange follows:

Q      How do you support your drug habit?
A      I don't have a drug habit.

*      *      *      *      *      *      *

Q      Mr. White, the reason you took the thousand dollars that night is the fact that you have a drug habit; isn't that right?
A      I don't.

*      *      *      *      *      *      *

Q      You have a problem with heroine [sic] don't you?
A      No, sir.
Q      Snorting it up your nose?
A      No, sir.
Q      They call it getting your nose dirty?
A      No, sir.
Q      And you have a problem with cocaine?
A      No, sir.
Q      Not at all?
A      Not at all.
Q      So that money was not used by you to pay for drugs?
A      Five dollars?
Q      Not the five dollars, the thousand dollars I'm talking about, Mr. White.  The one that you're accused of stealing; is that right?
A      No, sir.
Q      You didn't spend a thousand dollars on drugs?
A      Five dollars?

The Commonwealth argued that the questions were relevant to establishing the appellant's motive for stealing the $1,000.  The court overruled appellant's objection.

II.

ANALYSIS

A.

SUFFICIENCY OF THE EVIDENCE

On appeal, we view the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth.  Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975).  In a case involving purely circumstantial evidence, "'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence,

- 5 -

and must exclude every reasonable hypothesis of innocence.'"  Williams v. Commonwealth, 14 Va. App. 666, 670, 418 S.E.2d 346, 348 (1992) (quoting Bridgeman v. Commonwealth, 3 Va. App. 523, 526, 351 S.E.2d 598, 600 (1986)).

The facts show that Scott placed $1,000 dollars in her Bible on the night of March 1. Appellant was looking at Scott when she put the money in the Bible.  The next day, that money was gone.  Other than Scott, there were only six people in the house during the eleven-and-a-half hours between Scott placing the money in the Bible and her discovering that it was missing. Four of these were children who lived in the house.  One of the children was a two year old, who could not have taken the money.  Each of the other children testified that they did not take the money.  A fifth person in the house that evening was Runner.  The evidence showed that Runner arrived at the house with Scott, that he was with Scott the entire time he was in the house, that he never entered the bedroom where the money was, and that he left a few minutes later with Scott and the appellant.  The only other person in the house within the relevant time frame was the appellant.

We find that the evidence is sufficient to uphold a conviction of grand larceny.  The Commonwealth is not required to "exclude the possibility that others may have committed the crime."  Fordham v. Commonwealth, 13 Va. App. 235, 239, 409 S.E.2d 829, 831 (1991). Rather, "[t]he Commonwealth is only required to exclude hypotheses of innocence that flow from the evidence, and not from the imagination of the accused's counsel."  Id.  The Commonwealth's evidence showed that only seven people had any access to the bedroom where the money was, only two people knew that Scott had the money, and only the appellant saw Scott put the money in the Bible.

What the Commonwealth must do is "to prove beyond a reasonable doubt that motive, time, place, means and conduct concur in pointing out the accused as the perpetrator of the

crime." Boykins v. Commonwealth, 210 Va. 309, 312, 170 S.E.2d 771, 773 (1969). In this case, time, place, and means clearly concurred in providing the appellant the opportunity to steal the money. While mere opportunity to commit an offense raises only "the suspicion that the defendant may have been the guilty agent," and is never sufficient to sustain a conviction on its own, "[o]pportunity is always a relevant circumstance . . . and, when reinforced by other incriminating circumstances, may be sufficient to establish criminal agency beyond a reasonable doubt." Christian v. Commonwealth, 221 Va. 1078, 1082, 277 S.E.2d 205, 208 (1981).

"'In all cases of circumstantial evidence *the conduct of* the accused is always an important factor in the estimate of the weight of circumstances which point to his guilt.'" Pearson v. Commonwealth, 221 Va. 936, 946, 275 S.E.2d 893, 900 (1981) (quoting Dean v. Commonwealth, 73 Va. (32 Gratt.) 912, 923 (1879)). The appellant exhibited a number of unusual behaviors. Appellant told Scott not to come home, he went in and out of her room several times, he asked her if she was going to cook when she already had, he asked her if she was all right after she had already said that she wasn't, and he said he would be back in a couple of hours, but never returned. In addition, the appellant had at least $20 on his person and was willing to pay someone to drive him to the store despite not having a job or any source of income. This contradicts both Scott's testimony that she only gave him five dollars, and the appellant's own testimony that he only had five dollars. While each single piece of evidence may be insufficient to overcome the Commonwealth's burden, "the 'combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion.'" Juniper v. Commonwealth, 271 Va. 362, 416, 626 S.E.2d 383, 418 (2006) (quoting Chichester v. Commonwealth, 248 Va. 311, 329, 448 S.E.2d 638, 650 (1994), cert. denied, 513 U.S. 1166 (1995)). Taken as a whole, the evidence, including appellant's actions and statements, is consistent with a finding of guilt and excludes all reasonable hypotheses of

innocence. We find that the Commonwealth met its burden in this case and that the court's finding of guilt was not plainly in error.

B.

OTHER CRIMES EVIDENCE

Appellant maintains the trial court erred in permitting the Commonwealth to question him as to his drug use, arguing that the prejudicial effect of such other crimes evidence outweighed its probative value.

We note that other crimes evidence is admissible where, as here, "the motive . . . of the accused is involved . . . ." Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). The evidence in this case as to appellant's lack of funds to purchase drugs offers a motive for stealing Scott's money. Further, we note that evidence of appellant's drug use was already before the court, being so introduced without objection on the cross-examination of Scott when she stated, "[H]e always talking about he wanted to go score some dope and all this mess. And I [wasn't] going to hand him no money to score no dope."

That being said, and assuming without deciding the prejudicial effect surmounted that probative value, we turn to Code § 8.01-678, which states in pertinent part:

> When it plainly appears from the record and the evidence given at trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any . . . defect, imperfection, or omission in the record, or for any error committed on the trial.

In Clay v. Commonwealth, 262 Va. 253, 546 S.E.2d 728 (2001), our Supreme Court adopted the following standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), to non-constitutional error:

> "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the

erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the conviction cannot stand."

Clay, 262 Va. at 260, 546 S.E.2d at 731-32 (quoting Kotteakos, 328 U.S. at 764-65); see also

Atkins v. Commonwealth, 272 Va. 144, 154, 631 S.E.2d 93, 98 (2006).

Applying this standard, if the trial court erred in admitting the challenged other crimes evidence, we find that error harmless.

Affirmed.